No. 20 April 23, 2026 173

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

LIANNA ROSE MILLER,
*Petitioner on Review.*

(CC 22CR37717) (CA A181248) (SC S071645)

En Banc

On review from the Court of Appeals.*

Argued and submitted November 6, 2025.

Nora E. Coon, Deputy Public Defender, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

Adam W. Holbrook, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Interim Deputy Attorney General.

BUSHONG, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____
* Appeal from Multnomah County Circuit Court, Melvin Oden-Orr, Judge. 336 Or App 606, 561 P3d 675 (2024).

**BUSHONG, J.**

This criminal case presents two issues related to defendant's conviction for driving under the influence of intoxicants (DUII). The first is whether the trial court erred in denying defendant's motion to suppress statements that she made to a police officer in a hospital emergency room, where she was being treated for injuries after crashing her car. The second is whether the trial court erred in denying defendant's motion to suppress the results of a blood test that revealed that defendant's blood alcohol content (BAC) was well above the legal limit. On the first issue, the Court of Appeals concluded that Article I, section 12, of the Oregon Constitution—which prohibits compelled self-incrimination—did not require suppressing the statements, because defendant was not in "compelling circumstances" at the time; on the second issue, it concluded that Article I, section 9, of the Oregon Constitution—which prohibits unreasonable searches and seizures—did not require suppressing the blood test results, because defendant had knowingly and voluntarily consented to the blood draw. *State v. Miller*, 336 Or App 606, 561 P3d 675 (2024). We allowed defendant's petition for review.

On the first issue, the general rule is that we must examine the totality of the circumstances in deciding whether the police conducted an interrogation under compelling circumstances, such that the state is required to establish that defendant was advised of her constitutional rights and validly waived those rights before the interrogation. *State v. Nichols*, 361 Or 101, 107, 390 P3d 1001 (2017). If the circumstances were not compelling, we must still determine whether any statements made by defendant were voluntary. *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1991). Viewing the circumstances in their totality, we conclude that defendant was not in compelling circumstances when she was briefly questioned by a police officer in the emergency room, and we further conclude that her statements to the officer were voluntary despite her intoxication and physical condition. On the second issue, we again must examine the totality of the circumstances, and we conclude under the circumstances of this case that defendant voluntarily consented to

the blood draw. Accordingly, we affirm the decisions of the trial court and the Court of Appeals on both issues.

## I.    BACKGROUND

The question of what transpired at the time of a police interrogation is a factual question, and we are bound by the trial court's findings of historical fact if evidence in the record supports them. *State v. James*, 339 Or 476, 481, 123 P3d 251 (2005). If the trial court did not expressly make a necessary factual finding and there is evidence from which a fact could be decided in more than one way, we presume that the trial court decided the fact in a manner that was consistent with the trial court's ruling. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). However, we "assess anew" whether those facts meet constitutional standards. *James*, 339 Or at 481; *see also State v. Jackson*, 364 Or 1, 21, 430 P3d 1067 (2018) ("Voluntariness is a question of law for this court. This court reviews the voluntariness of defendant's statements anew, but is bound by the trial court's findings of fact if supported by the record." (Internal citations omitted.)); *State v. Ward*, 367 Or 188, 198, 475 P3d 420 (2020) (this court treats "the question of whether [a] waiver is voluntary [as] ultimately a question of law"). Similarly, whether defendant validly consented to a search of her blood is a question of law that we ultimately review for legal error, reviewing the facts in the same manner. *Ehly*, 317 Or at 75. We begin by summarizing the trial court's findings and other historical facts from the record that were necessary to, and are consistent with, the trial court's ruling.

### A.   *Historical Facts*

The trial court found that defendant had crashed her car into a parked vehicle at about 6:20 p.m. on July 15, 2022. When Portland Police Officer Justin Winter arrived at the scene, an ambulance was already there, attending to defendant. Winter briefly interacted with defendant, obtaining her driver's license and vehicle information. Winter did not notice any signs of impairment, but he did see that defendant was bleeding from a head injury. She was transported by ambulance to Legacy Emanuel Hospital, where she was evaluated and treated. As part of that treatment,

defendant was given Fentanyl, a fast-acting pain medication, whose analgesic effects last between 30 and 45 minutes. The hospital took a blood draw for treatment purposes and tested it; that test revealed a BAC of 0.456 percent. The hospital reported the results of that blood test to the police as required by Oregon law.[1]

Based on that report, Portland Police Officer Rory Mount went to the hospital to speak to defendant. Mount knew, before speaking to defendant, that the hospital's initial blood draw showed that she had a BAC of 0.456 percent. Mount arrived at the hospital sometime after 10:00 p.m. The nurses directed him to defendant, who was lying in a hospital bed in the hallway of the emergency room. Mount saw another person standing behind defendant in the hallway, but he did not see that person interacting with defendant. Mount was wearing his police uniform at the time, and he introduced himself to defendant as "Officer Mount from the Portland Police Bureau." Mount then explained defendant's *Miranda* rights and asked if she was willing to talk to him.[2] Then they "just started talking" about the incident that had led to her treatment in the hospital emergency room.

Mount testified that he informed defendant of her *Miranda* rights because he thought that she should know her rights before answering any questions. He said that he did not think that he had probable cause to arrest defendant at that point and that he would have let defendant "get up and leave" if she had decided to do so. Mount observed that defendant had bloodshot, watery eyes, but he saw no other signs of intoxication. Mount described his interaction

---

[1] ORS 676.260 requires health care facilities to report the results of any blood test performed while treating a patient involved in a motor vehicle accident if the person's BAC meets or exceeds 0.08 percent.

[2] Mount did not specify or otherwise describe the *Miranda* rights that he explained to defendant. However, it is generally understood that, under *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), before conducting a custodial interrogation, police officers must inform individuals that they have the right to remain silent, that anything they say can and will be used against them in a court of law, that they have the right to have an attorney present during the interrogation, and that, if they cannot afford an attorney, one will be appointed for them on request before the interrogation. *State v. Reed*, 371 Or 478, 485, 538 P3d 195 (2023) (citing *Miranda*, 384 US at 479).

with defendant as "normal," and he did not notice anything that "seemed off" during their conversation. Defendant told Mount that she had consumed two glasses of wine that evening. She also told Mount that she had sustained an injury to her head when she got out of her vehicle and fell over something in the road.

Mount testified that he asked defendant "if she would consent" to a blood draw to check her BAC, and that she "seemed to understand" his request. When asked what defendant said in response, Mount testified that "she agreed to have a blood draw done." One of the nurses at the hospital then performed a blood draw. According to Mount, defendant "seemed to understand" what the nurse was asking her to do, and she complied with the nurse's instructions. After the blood draw, Mount wrote citations for DUII and reckless driving, gave them to defendant, and explained what they were. Mount testified that defendant "seemed surprised" to be getting the citations, but she "seem[ed] to understand" that the citations were related to "a legal proceeding." The blood draw, taken about four hours after the crash, was the second one that was taken at the hospital. The resulting test revealed a BAC of 0.309 percent.

B.  *Procedural Facts*

Before trial, defendant moved to suppress the statements that she had made to Mount at the hospital, contending that her statements were not voluntary, and thus using them against her violated her rights under Article I, section 12. She also moved to suppress the second blood test results under Article I, section 9, contending that she had not validly consented to the blood draw.[3]

Officers Winter and Mount testified at the suppression hearing, as did Abigail Ritter, a physicians assistant in the trauma department at the hospital. The officers testified

---

[3] It does not appear that the state ever intended to offer into evidence the results of the hospital's test of the first blood draw that the hospital took for treatment purposes. That may have been due to chain of custody and other evidentiary issues that could prevent the state from using the results of a medical blood draw. *See State v. Kelly*, 305 Or App 493, 497-98, 469 P3d 851 (2020) (describing the evidentiary problems presented when a hospital "drew and tested [the] defendant's blood for medical purposes, not forensic purposes").

about their brief interactions with defendant, which the trial court accepted in its findings of historical fact, summarized above. Ritter did not have an independent recollection of treating defendant, but she was able to refresh her memory by referring to the hospital chart notes. She testified that the hospital emergency department had "upgraded" defendant to a trauma patient out of concern for a life-threatening injury after she lost consciousness. The emergency department reported that defendant was "somnolent" or sleepy and difficult to arouse. Ritter explained that, when defendant was upgraded to a trauma patient, she was not functioning normally.

Ritter saw defendant "within minutes" of the decision to upgrade her to a trauma patient, at about 8:00 p.m. Ritter explained that the hospital had administered two doses of Fentanyl for pain, which was a fairly common practice. She did not know when either dose was administered, but she explained that Fentanyl is a "short acting" analgesic that produces analgesic effects within one to two minutes, with its peak effects occurring around five to ten minutes after it is given. She indicated that the analgesic effects usually have "worn off" within 30 to 45 minutes, depending on the dose. Ritter was not asked to explain how Fentanyl could have affected defendant's cognitive ability, if at all. Ritter further explained that defendant had to consent to the administration of Fentanyl and other care that was provided to her at the hospital, and that the hospital would have proceeded based on her verbal consent.

Ritter testified that a blood sample taken by the hospital as part of their normal workup revealed a BAC of 0.456 percent, which, as noted, was reported to the police as required by Oregon law. She described that as a "very markedly elevated" BAC.[4] She explained that, depending on the person, blood alcohol levels that high can lead to respiratory depression, hypothermia, cardiac arrest, and even coma or death. However, she noted that someone who is "chronically exposed to alcohol" and uses it on a regular basis may not

_____

[4] By comparison, a person commits the offense of driving under the influence of intoxicants if the person drives a vehicle with a BAC of 0.08 percent or more. ORS 813.010.

show those significant, life-threatening effects. Ritter further explained that a person with a BAC that high most likely would not be functioning "entirely normally," but the person could potentially be able to walk and speak coherently.

Ritter also explained that alcohol in a person's blood generally dissipates at the rate of 0.02 to 0.025 percent per hour, depending on the person's physiology. She did not offer any opinion about defendant's capabilities at the time of the interrogation, nor did she explain how a BAC of 0.309 percent—the BAC revealed by the second blood test—would typically affect someone. She indicated that, if a person was "already conversant and ambulatory" at a higher BAC, then it would not take the hospital very long to determine that it was safe to discharge the person from the hospital.

The trial court denied defendant's motions to suppress. The court ruled, based on the totality of the circumstances, that defendant had knowingly and intentionally waived her right to remain silent, and that she had knowingly and voluntarily consented to the second blood draw. Defendant then entered a conditional guilty plea to the DUII charge, reserving her right to appeal the denial of the motions to suppress.

On appeal, the Court of Appeals first concluded that the trial court had not erred in denying the motion to suppress the statements defendant made at the hospital. *Miller*, 336 Or App at 609. The court concluded that the circumstances of the interrogation at the hospital "were not compelling." *Id.* at 608. From that conclusion, the court determined that "*Miranda* warnings were not required, which rendered the corollary requirement to obtain a valid waiver of [the rights enumerated in those warnings] unnecessary." *Id.* at 609.[5]

The court further concluded that the trial court had not erred in denying the motion to suppress the results of the blood test. The court acknowledged that defendant's

---

[5] After concluding that the officer was not required to obtain of waiver of the rights enumerated in the *Miranda* warnings, the Court of Appeals did not go on to address whether defendant's statements were voluntary.

intoxication, her head injury, and the fact that she had been given Fentanyl were "relevant to the question of her autonomy and, thus, her capacity to consent," but the court relied on "the trial court's express finding that [defendant] consented to the blood draw, along with the implied finding that she did so voluntarily[.]" *Id.* at 610. Those findings, the court concluded, were supported by the record in this case. *Id.*

We allowed review to address the constitutional issues presented by defendant's motions to suppress.

## II.   DISCUSSION

A.   *Motion to Suppress Statements at the Hospital*

Before addressing whether Article I, section 12, of the Oregon Constitution required suppressing the statements that defendant made at the hospital, it is helpful to first summarize how we have interpreted that constitutional provision. We begin with that overview.

Article I, section 12, states that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself." That provision "affords a constitutional right to remain silent." *State v. Vondehn*, 348 Or 462, 474, 236 P3d 691 (2010). Article I, section 12, generally requires the police to "inform a person subjected to a custodial interrogation that he or she has a right to remain silent and to consult with counsel and that any statements that the person makes may be used against the person in a criminal proceeding." *Id.* In addition to custodial interrogations, Article I, section 12, also requires the police to inform a person of those rights when they interrogate the person under "compelling circumstances." *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987);[6] *see also Vondehn*, 348 Or at 472 (noting that *Magee* recognized that Article I, section 12, "furnishes

---

[6] In *Magee*, we had asked the parties to brief the concept of "full custody" as it applied to the *Miranda* requirements, but we concluded that it had limited usefulness under Article I, section 12, because that provision addresses "compelled" statements. We explained that the concept of "full custody" was helpful because it "informs officers of a point at which no further question about the need to warn a detained person arises[,]" but that its "usefulness ends" when addressing other settings "that judges would and officers should recognize to be compelling[.]" 304 Or at 265.

an independent basis" for requiring *Miranda* warnings in compelling circumstances, an analysis that this court has "consistently" applied since *Magee*).[7]

In addition to guaranteeing a right to remain silent, Article I, section 12, provides for "a 'derivative or adjunct right to have the advice of counsel in responding to police questioning.'" *State v. Reed*, 371 Or 478, 483, 538 P3d 195 (2023) (quoting *Ward*, 367 Or at 190-91). The "derivative" or "adjunct" right to counsel "applies only when a suspect is placed in full custody or when circumstances create a setting which judges would and officers should recognize to be compelling, *i.e.*, the same compelling circumstances that give rise to the right to *Miranda* protections more generally." *State v. Turnidge (S059155)*, 359 Or 364, 400, 374 P3d 853 (2016), *cert den*, 577 US 829 (2017) (internal quotation marks omitted). In addition, we have indicated that the "adjunct" right to counsel attaches "when a defendant is either in custody or compelling circumstance[s] *and only then if the defendant invokes the right*." *State v. Randant*, 341 Or 64, 70, 136 P3d 1113 (2006) (emphasis added).

Thus, it is now well established that, to protect a person's Article I, section 12, rights, before the police may ask any questions, they "are required to give *Miranda* warnings to persons *in custody* or otherwise *compelling circumstances*." *Reed*, 371 Or at 486 (emphases in original; internal quotation marks omitted); *see also State v. McAnulty*, 356 Or 432, 454, 338 P3d 653 (2014) (stating that, before questioning a suspect, "police are required to give *Miranda* warnings to persons in custody or otherwise compelling circumstances"). That is because "circumstances other than custody can be coercive—that is, they can undermine an individual's ability or willingness to exercise their constitutional rights." *Reed*, 371 Or at 486. Advising a person of their *Miranda* rights is required under those coercive circumstances "[t]o protect a person's right against self-incrimination" under Article I, section 12. *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006).

---

[7] As we explained in *Vondehn*, we commonly refer to the advice of rights that is "required to effectuate the protections afforded by Article I, section 12," as *Miranda* warnings, though, under Oregon law, that requirement comes from Article I, section 12, itself, not the United States Supreme Court case. 348 Or at 470.

The purpose of advising a person of their rights "is to counter the coercive effects inherent in custodial interrogations." *Reed*, 371 Or at 484. The warnings "are intended to inform individuals of their right to remain silent, assure them a continuous opportunity to exercise that right, and warn them of the consequences of waiving it." *Id.* at 485. They "serve to counteract the potentiality for compulsion and ensure that, if an individual makes a statement during a custodial interrogation, the statement is the product of free choice." *Id.* (internal quotation marks omitted). Advising people of their rights is necessary because "the right to be free from compelled self-incrimination is fulfilled only when the person is guaranteed the right to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Id.*

A person can waive their Article I, section 12, rights. *Vondehn*, 348 Or at 474. One purpose of advising a person in custody or in compelling circumstances of their *Miranda* rights before interrogating them is "to ensure that a person's waiver is knowing as well as voluntary." *Id.* But giving *Miranda* warnings at the outset of an interrogation "is not a guarantee that statements made after the warnings are voluntary." *Jackson*, 364 Or at 21. Instead, "[t]he reading of *Miranda* rights is a factor that weighs in favor of concluding that a defendant subject to police interrogation understands his or her ability to terminate questioning and to otherwise seek counsel rather than cooperate with law enforcement." *Turnidge*, 359 Or at 405 n 24.

When a defendant moves under Article I, section 12, to suppress a pretrial statement made by the defendant, the state bears the burden of proving, by a preponderance of the evidence, that the defendant's statement was voluntary. *See Roble-Baker*, 340 Or at 639 (after defendant files a motion to suppress, "it was the state's burden to show that defendant's unwarned statements were made before the circumstances became compelling"); *Stevens*, 311 Or at 137 (holding that, under Article I, section 12, the state must prove by a preponderance of the evidence that a defendant's statements after being advised of his *Miranda* rights were voluntary).

If the person is in custody or compelling circumstances, Article I, section 12, requires the police to inform the person of their *Miranda* rights before asking any questions. If the person invokes their adjunct or derivative right to counsel, all questioning must cease. To meet its burden of proving that statements made by a person in custody or compelling circumstances were both knowing and voluntary, the state must establish that the police informed the person of their *Miranda* rights before proceeding and that they obtained a knowing and voluntary waiver of those rights.

In contrast, if a person is not in custody or in compelling circumstances at the time of the interrogation, Article I, section 12, does not require the police to inform the person of their *Miranda* rights or obtain a knowing and voluntary waiver of those rights. But the state is still required to prove that the person made the statements to the police voluntarily.

Whether a person makes statements to the police voluntarily is a separate question from whether the police were required to inform a suspect of their *Miranda* rights or obtain a knowing and voluntary waiver of those rights. *See Jackson*, 364 Or at 21 ("The provision of *Miranda* warnings is not a guarantee that statements made after the warnings are voluntary."); *State v. Powell*, 352 Or 210, 229, 282 P3d 845 (2012) (stating that "the fact that the officer administered *Miranda* warnings does not necessitate a conclusion that any subsequent inculpatory statements were voluntary"); *Vondehn*, 348 Or at 481 n 9 (noting that voluntariness "is always a requirement for admission of a defendant's incriminating statements" and that, "[e]ven warned statements may be inadmissible if they are not otherwise voluntary"). The state must prove the voluntariness of a defendant's statements by a preponderance of the evidence. *Stevens*, 311 Or at 137.

Generally, whether a defendant's statements were voluntary "depends on whether or not, in the totality of the circumstances, [the] defendant's free will was overborne and his or her capacity for self-determination was critically impaired." *Jackson*, 364 Or at 21 (citing *McAnulty*, 356 Or at

459, and *State v. Acremant*, 338 Or 302, 324, 108 P3d 1139 (2005)).

With those principles in mind, we turn to whether the police interrogation in this case violated defendant's Article I, section 12, rights. We begin with whether defendant was in custody or compelling circumstances at the time of the interrogation.

It is undisputed that Mount did not arrest defendant or take her into police custody at the time of the interrogation, and that he informed her of her *Miranda* rights before he questioned her in the emergency room hallway. The state contends, and the Court of Appeals concluded, that the circumstances of Mount's interrogation were not compelling, and thus Mount was "not required to obtain a waiver" of the rights enumerated in the *Miranda* warnings. *Miller*, 336 Or App at 608. The state argues that determining whether an interrogation occurred under compelling circumstances requires courts to focus on the conditions that were created by the police. The circumstances here were not compelling, according to the state, because the hospital emergency room setting was not a condition that the police created. The state further contends that we recognized as much in *State v. Foster*, 303 Or 518, 739 P2d 1032 (1987).

Defendant disagrees with that reading of *Foster*. Defendant also disputes the notion that the *only* circumstances that can be considered compelling are those that were created by the police. She further contends that a police interrogation in a hospital emergency room is more like a custodial interrogation than other interactions between the police and the public, as some legal commentators have observed. *See* Ji Seon Song, *Policing the Emergency Room*, 134 Harv L Rev 2646, 2651 (2021) (noting that "police in the emergency room merit particular attention"); Kayley Berger, *In Whose Custody? Miranda, Emergency Medical Care and Criminal Defendants*, 11 UC Irvine L Rev 1197, 1198 (2021) (arguing that *Miranda* warnings should be required in hospital emergency rooms because "interrogating a suspect who is receiving emergency medical treatment poses a similar threat of abuse, coercion, and confusion" as interrogating a suspect in police custody); Jessica Wisowaty,

*Police Questioning in Hospitals: Custodial Interrogation or Not?*, 49 Seton Hall Legis J 888, 889 (2025) (arguing that, although police questioning of a suspect in a hospital is generally not considered a custodial interrogation, legislatures should take action to provide for greater protection for vulnerable patients). Defendant also contends that the fact that Mount informed defendant of her *Miranda* rights before questioning her confirms that the circumstances here were compelling.

We have recognized "the inherent level of coercion that exists" in custodial interrogations, *Scott v. Joslin*, 332 Or 373, 380, 29 P3d 1112 (2001), but we have not adopted any categorical rules regarding the level of coercion that may exist when police interrogate a suspect in noncustodial—but potentially compelling—circumstances. *See Reed*, 371 Or at 486 ("There is no bright-line rule under Oregon law for when circumstances are compelling for the purpose of Article I, section 12").

In *Roble-Baker*, we explained that, in determining whether a defendant's encounter with police officers took place in compelling circumstances, "this court has considered a host of factors." 340 Or at 640. Those factors include "(1) the length of the encounter, (2) the location of the encounter, (3) the defendant's ability to terminate the encounter, and (4) the amount of pressure exerted on the defendant." *Reed*, 371 Or at 487 (citing *Roble-Baker*, 340 Or at 640-41). Those factors "are neither the exclusive factors * * * nor are they to be applied mechanically." *Id.* Rather, in determining whether the circumstances are compelling, "this court will consider all the circumstances" in assessing whether the interrogation occurred in "the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id.*

Two of the *Roble-Baker* factors support the conclusion that the circumstances of this interrogation were not compelling. First, the length of Mount's interrogation was brief, and he was the only police officer present. Second, Mount did not exert any pressure on defendant to speak to him. Rather, he advised her of her *Miranda* rights, he asked if she was willing to speak to him, and they "just started

talking." Those factors do not describe a "police-dominated atmosphere."

The location of the encounter—a hallway of a hospital emergency room—can, in some circumstances, be as compelling as a custodial interrogation, as some courts have concluded. *See State v. Hewitt*, 153 Haw 33, 36, 526 P3d 558, 562 (2023) (holding that, "if a person is unable to leave a place of interrogation due to circumstances incident to medical treatment, determining whether the person is 'in custody' under a totality of circumstances requires an inquiry into whether the person was at liberty to terminate the interrogation and cause the officer to leave"); *State v. Grant*, 939 A2d 93, 102 (Me 2008) (holding that the defendant was in custody when he was interrogated in the hospital after police had used "a considerable degree of force" to subdue him and then handcuffed him during his transport to the hospital and the subsequent interrogation).[8]

This court addressed a police interrogation in a hospital setting in *Foster*. The defendant in that case was charged with felony murder. He moved to suppress, among other things, incriminating statements that he had made when the police questioned him in a hospital emergency room after the police had given *Miranda* warnings. The defendant contended that his statements were nonetheless involuntary because "he had been injured and was being treated in the hospital emergency room." 303 Or at 528. We found no Article I, section 12, violation, in part because this "was not an interrogation in a jail cell nor were the statements obtained as the result of questioning conducted in a police station or any other police-dominated environment." *Id.*

We decided *Foster* before we decided *Magee*, 304 Or 261, and, as noted, *Magee* is where we first concluded that the police were required to advise a suspect of their

---

[8] Some legal commentators have reached the same conclusion. *See* Song, 134 Harv L Rev at 2651 (noting that hospital emergency rooms receive urgent cases that often overlap with law enforcement, occupy an "outsized role" in healthcare, especially for people of lower socioeconomic means, and, consequently, present a "unique, and defined doctrinal area" to address the potential for police overreach); Wisowaty, 49 Seton Hall Legis J at 907 ("Interrogations of a suspect receiving emergency medical treatment pose threats of coercion and police abuse, and those who are uninformed of their *Miranda* rights are the most vulnerable to these tactics.").

*Miranda* rights before interrogating them under compelling circumstances as well as when the suspect is in custody. In addition, in *Foster*, the police gave *Miranda* warnings before they conducted the emergency room interrogation. Thus, our decision in *Foster* does not mean that a police interrogation in a hospital emergency room cannot involve compelling circumstances that would require *Miranda* warnings.

The hospital setting of this interrogation implicates another *Roble-Baker* factor—defendant's ability to terminate the encounter. Although Mount did not specifically testify that defendant could have terminated the encounter, he did testify that he did not think he had probable cause to arrest defendant and he would have let defendant "get up and leave" if she had decided to do so.[9] And because Mount had informed defendant at the outset that she had the right to remain silent, she could have simply declined to speak with him.

On the other hand, we recognize that a person who is in a hospital emergency room for medical treatment might believe that they must cooperate with the police and cannot simply terminate the police encounter. Police often confer with the medical providers, as Mount did here, and some patients in that situation might think that cooperation with the police is required to receive the medical care they need.[10] We have no difficulty concluding, therefore, that a hospital setting—like any setting in which police are present and engaged in questioning—has the potential to present compelling circumstances. Thus, we reject the state's argument that *Foster* created a categorical rule that an interrogation in a hospital setting cannot be considered compelling circumstances.

---

[9] Mount was never asked if defendant was physically restrained while she was lying in the hospital bed, but it is reasonable to infer from Mount's testimony that he would have let her "get up and leave" meant that defendant was not physically restrained at the time.

[10] *See* Song, 134 Harv L Rev at 2690 (noting that emergency room patients "cannot always see how their medical team's roles are conflated with those of police"); Wisowaty, 49 Seton Hall Legis J at 905-06 (noting that police presence in hospitals "can result in patients conflating the authority of law enforcement and medical personnel" and "may result in patients answering any questions police officers ask them out of fear their medical treatment might otherwise be delayed or denied").

We indicated in *Roble-Baker* that the "overarching inquiry" in determining whether circumstances are compelling "is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." 340 Or at 641. That does not mean that the *only* circumstances that we will consider compelling are those created solely by the police. In *Reed*, we did not indicate that we would only consider circumstances that were created by the police in deciding whether an interrogation occurred in compelling circumstances. Instead, we stated that we will consider "all the circumstances" to determine whether the interrogation occurred in "the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." 371 Or at 487.

One relevant circumstance is the number of police officers who were present at the time. *See State v. Shaff*, 343 Or 639, 642, 175 P3d 454 (2007) (one officer's presence inside a defendant's trailer while a second officer questioned him from the front door did not require *Miranda* warnings); *State v. Prickett*, 324 Or 489, 494, 930 P2d 221 (1997) (a person stopped by a single trooper for a traffic infraction "is neither in custody nor under compulsion in the constitutional sense").

Another relevant circumstance is whether the police informed the person of their Article I, section 12, rights before proceeding. But the fact that Mount informed defendant of her *Miranda* rights before questioning her did not make the circumstances compelling. *Turnidge*, 359 Or at 404 n 24 (stating that an officer's recitation of *Miranda* rights does not "transform the nature of the encounter from one that was not compelling into one that was"). Giving a *Miranda* warning might suggest that a police officer *thought* that the circumstances required a warning or might require a warning, but determining whether the circumstances were compelling "does not turn on either the officer's or the suspect's subjective belief or intent; rather, it turns on how a reasonable person in the suspect's position would have understood his or her situation." *Shaff*, 343 Or at 645.[11]

_____

[11] If informing people of their *Miranda* rights were enough to make the circumstances compelling for Article I, section 12, purposes, then police might choose not to do so. But we have never interpreted Article I, section 12, in a way

Defendant contends that a reasonable person in her position would have thought—from the fact that *Miranda* warnings were given—that they were under arrest. That is certainly possible, but, as we will explain next, the totality of the circumstances in this case leads us to conclude that Mount's encounter with defendant in the emergency room hallway did not occur in the type of coercive police-dominated atmosphere that *Miranda* warnings were intended to counteract. In other words, the circumstances of this interrogation were not compelling.

Here, Mount was the only police officer present at the time, his encounter with defendant was brief, and it occurred in a hallway with at least one other person standing nearby. Although defendant was injured and lying on a hospital bed, she could have told Mount that she did not want to talk to him or she could have chosen to remain silent, as Mount told her she had the right to do. According to Mount, he did not exert any pressure whatsoever on defendant to talk to him. Instead, he informed her of her *Miranda* rights and asked if she was willing to talk to him, after which they "just started talking." Considering all the circumstances, we conclude that Mount's interrogation did not occur in compelling circumstances.

It follows from that conclusion that *Miranda* warnings were not required, and the state was not required to establish a knowing, intelligent, and voluntary waiver of the rights enumerated in the *Miranda* warnings, as the Court of Appeals concluded. But, as explained above, that is not the end of the inquiry. Even if the circumstances were not compelling, the state must still establish that defendant's statements to Mount were voluntary.

The test for determining whether a defendant made statements voluntarily is not the same as the test for determining whether a defendant validly waived the rights enumerated in the *Miranda* warnings. *See Vondehn*, 348 Or at 474 (Article I, section 12, requires police to give *Miranda* warnings "to ensure that a person's waiver is knowing as

---

that gives the police an incentive to *not* inform suspects of their rights. That is why we indicated in *Turnidge* that the fact that police informed a suspect of their *Miranda* rights does not make the circumstances compelling.

well as voluntary"); *Acremant*, 338 Or at 324 (stating that, under Article I, section 12, "[t]he test for voluntariness *** is whether, under the totality of the circumstances, it is apparent that the defendant's will was not overborne and his capacity for self-determination was not critically impaired" (internal quotation marks omitted)).

Defendant first contends that Mount's conclusory testimony is insufficient to meet the state's burden of establishing by a preponderance of the evidence that her statements were voluntary. As defendant points out, Mount did not testify about the words he used when he informed defendant of her *Miranda* rights, nor did he testify about what, if anything, defendant said after he asked her if she understood those rights. Instead, they "just started talking." Mount characterized the conversation as "normal" and indicated that nothing "seemed off" during their brief discussion.

As we will discuss more fully below in connection with the issue of defendant's consent to the blood draw, Mount's conclusory testimony makes it more difficult for an appellate court to determine whether defendant's statements were voluntary. Nonetheless, we examine the totality of the circumstances "in reaching a legal conclusion about the voluntariness of defendant's statements." *Jackson*, 364 Or at 21. As we will explain, we conclude that defendant's statements were voluntary under the circumstances presented here.

Generally, whether a defendant makes statements voluntarily "depends on whether or not, in the totality of the circumstances, [the] defendant's free will was overborne and his or her capacity for self-determination was critically impaired." *Id.* at 21 (citing *McAnulty*, 356 Or at 459, and *Acremant*, 338 Or at 324). A defendant's free will can be overborne when statements are "induced by the influence of hope or fear" instilled by the police. *Id.*

Defendant does not contend that her free will was overborne by anything that Mount said, or did, that induced her to speak with him out of hope or fear. Instead, she contends that her capacity to speak voluntarily with Mount

was critically impaired by her level of intoxication, her head injury, and the Fentanyl that she had taken. The Court of Appeals saw those factors as "relevant to the question of her autonomy and, thus, her capacity to consent" to a blood draw, *Miller*, 336 Or App at 610, but it did not specifically address those factors in determining whether defendant had the capacity to make statements voluntarily.

Although we noted in *Jackson* that impairment of capacity is part of the test for voluntariness, we have never held that alcohol intoxication, or, as in this case, intoxication combined with the possible effects of a head injury and medically administered Fentanyl, rendered a person incapable of making a statement voluntarily. However, in *Stevens*, 311 Or at 132-36, we addressed whether a suspect's ingestion of methamphetamine before talking to the police meant that his statements were not voluntary.

The defendant in *Stevens* was arrested on murder charges at 8:25 a.m. on February 27. He told the police that he had injected methamphetamine on several occasions on the night of February 26, and in the early morning hours on February 27, before his arrest. *Id.* at 133-34. A urine sample tested positive for methamphetamine. *Id.* at 134. The detective who interviewed defendant had experience as a narcotics officer, and he testified that defendant "was alert and responsive" and that he "did not appear to be under the influence of any drug during the interview." *Id.* at 133. The defendant was advised of his *Miranda* rights at the time of his arrest and again at the county jail before the interrogation. *Id.* The defendant said that he understood those rights and that he was willing to talk to the detectives. *Id.* At the end of the interview, the defendant affirmed that he had made his statements knowingly, voluntarily, and intelligently. *Id.* at 134.

We held in those circumstances that the trial court did not err in concluding from its findings that the defendant's statements "were given voluntarily." *Id.* at 136. We summarized the trial court's findings and concluded that those findings were supported by the evidence. *Id.* We explained that nothing in the record "suggests that the police intimidated or coerced defendant in any way." *Id.* We

noted that the trial court "specifically found, after examining the evidence with particular concern about the issue, that [the] defendant's drug use did not impair his capacity to make a knowing, voluntary, and intelligent choice." *Id.*

*Stevens* does not resolve the issue presented here, but it supports the conclusion that defendant's statements to Mount were voluntary despite her alcohol intoxication, head injury, and the possible effects of the Fentanyl administered by the hospital.[12] Other cases that addressed the "capacity" part of the test for voluntariness provide only minimal guidance on the issue. That part of the test traces back to our decision in *State v. Vu*, 307 Or 419, 425, 770 P2d 577 (1989). *See Acremant*, 338 Or at 324 (citing *Vu* for the "test for voluntariness" under Article I, section 12).

In *Vu*, the defendant in a manslaughter case moved to suppress an incriminating statement that he had made to the police before his arrest, contending, among other things, that his statement was not voluntary "in light of cultural disparities and his deficits in English language skills." 307 Or at 424. We upheld the trial court's ruling that the state could impeach the defendant with the statement because it was "voluntary." *Id.* at 422. We first noted that "there was nothing in the record to suggest" that the defendant had made the statement "under the influence of fear produced by threats or of promises or intimation of favor." *Id.* at 424. Instead, we concluded that, "in light of the surrounding circumstances," the statement "was the product of an essentially free and unconstrained choice; [the] defendant's will was not overborne and his capacity for self-determination was not critically impaired." *Id.* at 425.

In analyzing whether the defendant's capacity was critically impaired at the time of the statement, we noted that the record showed that the defendant had "accurately complied with the officer's spoken requests" and that there

---

[12] Drugs and alcohol can affect people differently. Police officers often interview suspects and witnesses who may be impaired by drugs or alcohol. We have never held that intoxication alone rendered a person incapable of speaking to the police voluntarily. Although we do not foreclose the possibility that extremely high levels of drug or alcohol intoxication might render a person incapable of making a voluntary statement, we conclude that defendant could make statements to Mount voluntarily despite her high BAC.

was no evidence that he "misunderstood the question because of his poor [English] language skills." *Id.* Thus, we agreed with the trial court that, "[w]hatever the cultural disparities and alleged deficits in the English language, [the] defendant's statement was not involuntary." *Id.*

We also addressed how the potential impairment of a defendant's capacity might affect the voluntariness of a statement in *Foster*. As noted, the defendant in *Foster* argued that statements he made to police were involuntary because "he had been injured and was being treated in the hospital emergency room." 303 Or at 528. We disagreed, noting that the trial court had "specifically found that defendant was not physically or mentally impaired," and we reasoned that the hospital "was not a coercive environment." *Id.* We determined that the trial court's findings on the voluntariness issue "were supported by the record" and "justified the ultimate conclusion" that the defendant's statements were voluntary. *Id.*

Like the defendants in *Stevens*, *Vu*, and *Foster*, defendant contends that her statements were not voluntary because her capacity to make a voluntary statement was critically impaired. As we explained in *Jackson*, "[v]oluntariness is a question of law for this court," but the court "is bound by the trial court's findings of fact if supported by the record." 364 Or at 21. As we will explain, we conclude that defendant's statements to Mount were voluntary despite any impairment of her capacity due to her intoxication, the Fentanyl that the hospital had administered, and her head injury.

Mount began his interrogation shortly after 10:00 p.m., almost four hours after the crash and two hours after the emergency department had evaluated defendant, "upgraded" her to a trauma patient, and transferred her to Ritter's care. The only direct evidence of defendant's capacity at the time of the interrogation was Mount's testimony, and, as noted, he did not observe any effects of intoxication aside from bloodshot, watery eyes. Defendant spoke to Mount immediately after he informed her of her *Miranda* rights. According to Mount, defendant seemed to understand those rights and she was able to understand his questions and

respond appropriately. Although there is no evidence show-ing exactly *when* the Fentanyl had been administered or how it could have affected defendant's cognitive ability, Mount's observations suggest that much, if not all, of its effects had worn off by the time of the interrogation, because the anal-gesic effects wear off quickly, as Ritter had testified.

Ritter also testified that the emergency department had documented a fainting episode and drowsiness *before* defendant had been upgraded to a trauma patient around 8:00 p.m., but no such conditions were noted in the hospital records *after* that time. Ritter testified that defendant was able to understand and respond appropriately to Ritter's questions despite her head injury. Ritter also testified that, even though defendant's BAC was "markedly elevated," she was able to verbally consent to treatment at the hospital.[13]

We have already concluded that Mount's brief inter-rogation did not take place under compelling circumstances, and we further conclude that the evidence in the record is legally sufficient to establish that defendant's statements to Mount were voluntary. Accordingly, we agree with the Court of Appeals that the trial court did not err in denying defendant's motion to suppress the statements she made at the hospital.

B.   *Motion to Suppress Blood Test Results*

Defendant also contends that she did not validly consent to the second blood draw that was taken at the hos-pital after Mount asked for and received her verbal consent and cooperation. Defendant argues that (1) Mount's conclu-sory testimony did not establish that her consent was vol-untary, and (2) she was incapable of voluntarily consenting to a blood draw given her level of intoxication, her head injury, and the possible effects of the Fentanyl that had been

---

[13] All the evidence in the record regarding defendant's capacity to make a statement voluntarily was offered by the state, because, as noted, it was the state's burden to prove by a preponderance of the evidence that defendant's state-ments were voluntary. Defendant cross-examined the state's witnesses but did not offer any evidence of her capacity, because she did not have any burden to produce evidence of lack of capacity. We acknowledge that the state could have done a better job developing the record as to defendant's capacity at the time of the interrogation and that a record comparable to this one would have permitted a different trial judge to find that the state did not meet its burden.

administered at the hospital. As we will explain, we dis-
agree with both arguments.

   We begin with Mount's testimony concerning the
blood draw. A blood draw is a "search" under Article I, sec-
tion 9, which ordinarily requires a warrant, unless a war-
rantless search is authorized under an exception to the war-
rant requirement, such as consent. *State v. Bonilla*, 358 Or
475, 480, 366 P3d 331 (2015). When the state relies on the
consent exception, "it must prove by a preponderance of the
evidence" that defendant or someone authorized to act on
defendant's behalf "voluntarily gave the police consent to
search[.]" *Id.* at 481.

   Here, defendant does not dispute that she verbally
conveyed to Mount that she agreed to the blood draw and
that she physically cooperated with the nurses when they
drew her blood. But, defendant contends, Mount's conclusory
testimony that defendant had "agreed" to his request for a
blood draw does not establish consent to search under *State
v. Warner*, 284 Or 147, 585 P2d 681 (1978), because there
was no evidence of what Mount said to convey his request or
what defendant said in response to that request.

   The state disputes defendant's understanding of
*Warner* and questions whether that case remains "good law"
after our decision in *State v. Jacobus*, 318 Or 234, 864 P2d
861 (1993). As we will explain, we agree with defendant
that, under *Warner*, evidence of the actual words used is
important in determining whether a defendant has volun-
tarily consented to a search. We also conclude that *Warner*
remains "good law" after our decision in *Jacobus*. But we
agree with the state that, under the circumstances, the evi-
dence established that defendant had voluntarily consented
to the blood draw.

   The defendant in *Warner* was convicted of first-
degree robbery. On appeal, he challenged the trial court's
denial of his motion to suppress evidence seized by the
police after a warrantless search of the defendant's pockets
revealed a large amount of cash, several .38 caliber hollow
point bullets, and two .20-gauge shotgun shells, 284 Or at
154-55, and a warrantless search of his automobile revealed

a shotgun, a bag of money, and two ski masks, *id.* at 155. The state contended, among other things, that the defendant had consented first to a seizure of his person and then to the searches of his person and automobile. We rejected those arguments.

We first explained that Officer Myers had "stopped" the defendant and his accomplice to review their identification.[14] The state conceded that, at that point in the encounter, the police did not have a reasonable suspicion that the defendant had committed a crime, *id.* at 164-65, and we concluded "that there was no valid consent to this restraint," *id.* at 165. We then addressed Chief Hinrich's "request" that defendant and his accomplice empty their pockets onto the hood of the police car.[15] Again, the state conceded that, at that point, the police still did not have reasonable grounds to suspect that either man had committed a crime, and we concluded that "there was no valid consent" to Hinrich's request. *Id.* at 166. We then concluded that the evidence obtained from the search of the defendant's automobile was "tainted by the illegal seizure of the defendant's person and the illegal search of his pockets, and therefore [had to] be suppressed." *Id.*

In reaching those conclusions, we noted that conclusory testimony regarding a claim of consent creates "a problem for appellate courts" that "arises from the fact that counsel and the trial court fail[ed] to make a record as to what the witness actually contends was said." *Id.* at 159. We noted, for example, that there was no testimony by Hinrich

---

[14] Myers testified that, when the two men started to leave the bar where he first encountered them, he "asked" them to return to the bar, remove their wallets from their pockets, take out their IDs and place them on the table. *Warner*, 284 Or at 151. Both men complied with those requests. Myers further testified that he then "asked" the men to come out to the police car so that he could run license and warrants checks. *Id.* They again complied.

[15] Hinrich testified that he "asked" the men "if [they would] mind emptying their pockets on the hood of the car." *Warner*, 284 Or at 154. Another officer testified that Hinrich had walked up and said, "All right, empty your pockets." *Id.* In any event, the men complied. Hinrich then "asked" for defendant's permission to search the interior of the automobile, to which the defendant responded, "The doors are open, help yourself." *Id.* at 155. Myers testified that, after arresting the suspects, an officer then "asked" the defendant if they could look in the truck, to which the defendant replied, "I don't give a fuck, the keys are in my pocket." *Id.* at 156.

"as to the words he claims to have actually used when he 'asked' the two men to do certain things." *Id.* at 160.[16] We indicated that, because the state has the burden of proving that consent was voluntarily given, "district attorneys would be well advised to keep in mind that appellate courts must know what the state's witnesses contend was actually said" to assess the validity of any consent. *Id.* at 160-61.

As noted, the state questions whether *Warner* remains "good law" after our decision in *Jacobus*. The state reads too much into *Jacobus*. The defendant in that case was convicted of unlawful possession of a controlled substance. On appeal, he challenged the trial court's denial of his motion to suppress the heroin that a police officer had found in a container retrieved from the pocket of a coat that was lying on the floor of the defendant's vehicle. The officer testified that he responded to a call from a convenience store clerk who overheard the occupants of a vehicle say that "there was only one clerk in the store." 318 Or at 236. Upon his arrival on the scene, the officer saw the occupants of a parked vehicle "frantically" trying to stuff something under the vehicle seats. *Id.* He saw the defendant "stuffing stuff down on the floorboard of the vehicle under some coats and stuff." *Id.* The officer then ordered defendant and the other occupants to get out of the vehicle. After the defendant acknowledged that the coat was his, the officer then asked the defendant if he "minded if [the officer] looked through the coat." *Id.* at 237. The defendant replied, "Go ahead." *Id.* As the officer pulled the coat out of the car, a small container fell out of the coat pocket. The officer then asked the defendant "if he minded if [the officer] looked through it." *Id.* The defendant again replied, "Go ahead." *Id.* The officer discovered heroin in the container and arrested the defendant.

---

[16] We made the same observation regarding the officer's conclusions about a defendant's response to a request for consent. For example, we indicated that Myers's testimony that the defendant had "indicated a willingness to comply" after Myers had "asked" him to put his ID on a table was not enough under the circumstances to establish a valid consent to that restraint. *Id.* at 165. We noted that the district attorney had "failed to ascertain from the witness" *how* the defendant and his accomplice had "indicated a willingness to comply." *Id.* at 165 n 6. In other words, the district attorney had "adduced from the witness neither the words nor the gestures from which *Myers drew a conclusion* of compliance." *Id.* (emphasis added).

We first concluded that the officer had "stopped" the defendant when he ordered him out of the car, and that the stop was lawful, because the officer had a reasonable suspicion that the defendant had committed or was about to commit a crime. *Id.* at 241. In determining whether the defendant's consent to the search was valid, we first noted that, when the defendant gave his consent, there were two officers present, but neither had displayed a weapon. *Id.* at 243. One officer had "asked" the defendant whether he could "look in" the coat and "look into" the container, and the defendant had "answered both questions in the affirmative." *Id.* We further noted that the officer "did not use force or threat of force, made no promises, and used no other forms of coercion" in obtaining the defendant's consent." *Id.* We concluded that those circumstances, "in their totality, support[ed] the trial court's conclusion that [the] defendant voluntarily consented to the search of his possessions." *Id.* In reaching that conclusion, we cited *Warner* with a "*see also*" signal and a parenthetical that stated, "whether findings of historical fact are sufficient to support the trial court's conclusion that a person voluntarily consented to a search is a question of law for the appellate courts." *Id.*

Neither the result in *Jacobus* nor our brief citation to *Warner* calls into question the continued validity of that decision. Although the testimony about the police requests for consent to search in both cases was conclusory in some respects, the results were different because the circumstances of the searches were very different. Whether the defendant in each case had voluntarily consented to a search depended on the totality of the circumstances.

As we noted in *Warner*, our ability to assess on appeal whether a defendant voluntarily consented to a search is hampered when police officers testify in conclusory fashion that the officer "asked" for or "requested" consent, that the defendant had "complied" with the officer's request, and that he had "agreed" or "consented" to the search. *Warner*, 284 Or at 159-61. That is why we stated that district attorneys "would be well advised" to elicit testimony of what "was actually said," and not the officer's characterization or conclusions. *Id.* at 160-61. We adhere to that statement. Read

together, *Warner* and *Jacobus* stand for the proposition that whether a defendant has voluntarily consented to a search depends on the totality of the circumstances, and evidence about what was *actually said*—not the officer's characterization of what was said—is particularly relevant in determining whether the state has met its burden of establishing that the claimed consent was voluntary.[17]

But an officer's failure to testify to the actual words used to convey a request for consent to search and the words used in response to that request does not necessarily mean that the state has failed to meet its burden. Although Mount's testimony in this case about his request for a blood draw and defendant's response was conclusory, we reject defendant's argument that Mount's conclusory testimony was insufficient as a matter of law to establish that defendant had voluntarily consented to the blood draw. Mount testified that, when he asked defendant "if she would consent" to a blood draw to check her BAC, defendant had "agreed to have a blood draw done" and then cooperated with the nurses. We conclude under the circumstances that that testimony was sufficient to meet the state's burden of establishing that defendant consented to the blood draw.[18]

Turning to defendant's second argument—that defendant was incapable of voluntarily consenting to a blood draw—defendant does not contend that Mount improperly coerced her into agreeing to have her blood drawn to check her BAC or that she merely acquiesced to Mount's demand.

---

[17] That is consistent with the Court of Appeals' approach to the consent issue. Under that approach, to establish consent, the state first must establish that the defendant's consent "was, in fact, consent, and 'not mere acquiescence to a thinly veiled demand.'" *State v. Tennant*, 310 Or App 70, 75, 483 P3d 1226 (2021) (quoting *State v. Brock*, 254 Or App 273, 178-79, 295 P3d 89 (2012)). In determining whether a particular interaction amounts to consent and not mere acquiescence, the Court of Appeals looks "to the totality of the circumstances present during the encounter." *Id.* at 76. The words used by the officer requesting consent are "not dispositive" but are "particularly relevant to the totality of the circumstances." *Id.* Thus, the better practice is for more specificity about what was said, and trial courts can certainly require more of this "particularly relevant" testimony.

[18] Although we conclude that Mount's testimony in this case was sufficient to meet the state's burden of establishing by a preponderance of the evidence that defendant had consented to the blood draw, that means that the trial court did not err in relying on that testimony. It does not mean that the trial court was required to accept that testimony.

Instead, she contends that, because of her intoxication and physical condition, she could not understand what she was being asked to do, and, therefore, she did not voluntarily consent to the blood draw, just as she did not voluntarily agree to speak to Mount at the hospital. We are not persuaded.

Defendant gave her verbal consent to the blood draw at the conclusion of Mount's interrogation. There was no evidence that defendant's condition had deteriorated during that brief interrogation. If defendant was capable at the beginning of the interrogation of making voluntary statements to Mount, as we have concluded, then she was also capable at the end of the interrogation of voluntarily consenting to a blood draw. Her agreement and cooperation with the nurses taking her blood support the conclusion that she was capable of voluntarily consenting to the blood draw. Accordingly, for the reasons discussed above, we conclude that, under the totality of the circumstances, defendant voluntarily consented to the blood draw, just as she voluntarily agreed to speak to Mount.

In summary, we conclude that the trial court did not err in denying defendant's motions to suppress the statements she made to Mount at the hospital and the results of the second blood test.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.