728 February 12, 2025 No. 88

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DIANA RODRIGUEZ,
*Defendant-Appellant.*

Washington County Circuit Court
19CR34906; A177427

Erik M. Bucher, Judge.

Argued and submitted January 3, 2024.

Bear Wilner-Nugent argued the cause and filed the briefs for appellant.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Ortega, Judge, and Mooney, Senior Judge.

MOONEY, S. J.

Reversed and remanded.

## MOONEY, S. J.

Defendant appeals a judgment of conviction for two counts of first-degree sodomy, ORS 163.405; three counts of first-degree rape, ORS 163.375; two counts of second-degree sodomy, ORS 163.395; one count of second-degree rape, ORS 163.365; and four counts of using a child in a display of sexually explicit conduct, ORS 163.670. Defendant raises three assignments of error: (1) that the trial court erred when it denied defendant's motion to suppress statements she made to the police under compelling circumstances, without the benefit of *Miranda* warnings; (2) that the trial court erred when it gave the witness false in part jury instruction; and (3) that the trial court erred when it added language that "[t]he threat of future injury is not sufficient to constitute duress," to the uniform duress instruction, contending that the instruction thus given misstated the law.

We conclude that the trial court erred when it denied defendant's motion to suppress because she made the statements that she sought to suppress in compelling circumstances without having been advised of her *Miranda* rights. Because it could arise again on remand, we address the third assignment of error and conclude that the trial court erred when it instructed the jury that "the threat of future injury is not sufficient to constitute duress" because that amounted to a misstatement of the law.[1] We, therefore, reverse and remand.

## I.   HISTORICAL AND PROCEDURAL FACTS

We provide the following description of the underlying historical and procedural facts to provide context for our analysis.

### A.   *Defendant's Marriage*

Defendant and her former husband were married in 2006, separated in 2014, and divorced in 2017. Defendant's former husband did not cooperate with the divorce proceedings, and the judgment was entered by default. During the first eight years of their marriage, the couple lived in

---

[1] Our resolution of defendant's challenge to the denial of the suppression motion obviates the need for us to address the second assignment of error.

various locations with the husband's family, which included his brother, his brother's wife, and their five young children—defendant's former husband's nieces and nephews.

Defendant testified that her former husband began to routinely rape her shortly after they were married, specifically because she did not want to engage in certain sexual acts with him. He would choke and strangle her, throw her on the bed and pin her down, straddle her so she could not leave, punch her, and, in one instance, he held a pillow over her face. He did not allow defendant to see her family or to use her car. Defendant's former husband's nieces and nephews were aware that defendant's relationship with her former husband was tumultuous and violent. They had heard the couple fighting and defendant crying. They saw bruises on defendant's arms and legs, and they witnessed her former husband abuse defendant's cat which caused defendant emotional distress.

B.  *Defendant's Intellectual Limitations and Post-traumatic Stress Disorder (PTSD)*

Dr. Lynnette Hamilton, a licensed psychologist certified by the American Board of Forensic Psychology, testified that she evaluated defendant using first- and third-party interviews, historical medical and behavioral health records, and a battery of cognitive tests designed to assess and measure intellectual functioning. The state did not object to Hamilton's qualifications as an expert witness and offered no conflicting expert testimony.

Hamilton diagnosed defendant with PTSD based on "the abuse that [defendant] suffered at the hands of her" former husband, and she concluded that defendant has had lifelong intellectual limitations. Defendant attended special education classes throughout her school years, and she graduated late from high school with a modified diploma. Defendant scored in the average range for processing speed, low average in perceptual reasoning, borderline in working memory, and extremely low on verbal comprehension. Additional testing revealed that defendant was twice as likely to acquiesce to leading questions than the average person, and that she changed her responses slightly more

than average when given negative feedback. Given the interaction between defendant's low intellectual functioning and her elevated suggestibility, Hamilton testified that defendant was more likely than the average person to acquiesce, particularly when information is given to her orally. Hamilton explained that individuals with defendant's intellectual limitations develop a coping mechanism, called "passing." Instead of taking steps to try to understand or clarify something that they do not fully understand, such a person acquiesces without full understanding, as if they understand.

## C. *Sexual Abuse Allegations Against Defendant's Former Husband*

Defendant's former husband was investigated for sexually abusing his brother's children after one of those children reported the abuse to the police.[2] The abuse began when the children were under the age of twelve, and it continued over the course of several years. It included sexual acts perpetrated by defendant's former husband against the children directly, and by requiring two of the children to engage in sexual acts with defendant. The children described defendant's participation in their sexual abuse as being "direct[ed]" by her former husband and they said that he "pressured" and "made" her do things to them under "threat". Defendant's former husband would watch, and sometimes film, the abuse.

## D. *Police Interrogation of Defendant in Defendant's Apartment*

Defendant was questioned by the police in her own home in May 2019. At first, the questions focused on her former husband's conduct. But the focus of the interrogation shifted to questions about defendant's own sexual conduct with the children. The statements that defendant sought to suppress were made during that interrogation, which we now describe in more detail.

---

[2] Defendant's former husband was later convicted of numerous sexual offenses against four of his brother's children. *See State v. Juarez-Hernandez*, 316 Or App 741, 503 P3d 487 (2022) (reversing five of those convictions because they were based on nonunanimous jury verdicts and otherwise affirming the other twenty convictions).

Two detectives arrived unannounced at defendant's home in unmarked vehicles, wearing plain clothes.[3] They knocked on the door. When defendant answered the door, Detective Povolny identified himself as a police officer and asked to speak with her. Once inside, he explained that they wanted to ask defendant some questions about her former husband and his family for an ongoing investigation into the sexual abuse allegations against her former husband. The officers did not advise defendant of her *Miranda* rights.

The officers questioned defendant for nearly two and a half hours. The first 40 minutes focused on her former husband's conduct toward defendant and the children. The detectives then abruptly proceeded to question defendant for an additional hour and a half concerning her role in the sexual abuse of the children. There were times when defendant paused for noticeable periods of time before answering, and there were times when she cried before answering. Defendant struggled as the interrogation continued, and that was reflected in her choice of words which were often incorrect. She frequently spoke in the wrong tense and used incorrect pronouns. Defendant made a number of incriminating statements in which she graphically described several encounters involving sexual touching, as well as oral and penetrative sexual contact, in which she engaged with three of the children while they were under the age of 12. She indicated that those encounters occurred over the course of four years. At one point, near the end of the interrogation the questioning officer said, "like we told you, you're not in trouble. Like, you don't have to talk to us. You can kick us out any time you want, you know? But remember before when I was telling you like you're not a good liar? Do you remember that?" Defendant was not advised of her *Miranda* rights at any time during the two-and-a-half-hour interrogation.

E.    *Trial Court's Ruling on Defendant's Motion to Suppress*

The trial court found that the police interrogation of defendant was "perfectly fine" and "voluntary" because it took place in defendant's home, defendant let the officers inside, and she could have ended it at any time during the

_____

[3] A third officer was initially present to serve as a language interpreter, but that officer left after concluding that the officer's services would not be needed.

interrogation but chose not to do so. The trial court described the initial encounter discussing her ex-husband as a "very happy, relaxed encounter" where she and the officers were "get[ting] along really good" until the focus switched to her and she "g[ot] a little bit nervous." The trial court found that she could have told them to leave, and that she chose not to. Regarding the presence of compelling circumstances, the trial court said

> "it's not a compelled setting and it never becomes a *** compelled setting. I don't believe that there was any implied promises of leniency. I don't believe there was any threats made. I believe that this was just a total standard by-the-book interrogation. And no one has to take my word for it, I just get to make the ruling as far as the—the court and this trial is concerned, but for issues of appeal and the record, anybody who *** gets to look at this case in the future can listen to the State's Exhibit 1 themselves and determine if threats were made or there's promises of leniency or anything like that."

Regarding defendant's intellectual disabilities, the trial court stated its findings:

> "*** I don't think the defendant has any issues whatsoever tracking or corresponding. Because I was listening to what she was talking to, just the same way I'm talking to you all now. She had no problem doing that and answering the questions, and even disagreeing with the officers ***.
>
> "Regardless, it's at *** the 40 or so minute mark when *** she figured out finally that, 'Oh, my gosh, they're here for me.' And even at one point she starts crying a little bit and then stops, and then gets her composure and then starts to *** ask [*sic*] the rest of the questions as well. And you could just hear it in her voice that she felt that the tide had turned and that she's getting a little bit nervous.
>
> "At that point, she could have told them to leave. She didn't. Officers told her that—that she could tell them to leave. She didn't. She wanted to tell her story. So, it didn't become an involuntary encounter at any point in that time and even all the way up until the end, the very end ***.
>
> "Of course, in hindsight, I'm sure she wishes she didn't do that. She probably wishes she didn't meet with him. *** But, again, since it wasn't a custodial *** setting and it

was not compelling by any means, because it was in her apartment where she let him in and she could have kicked him out at any time, the statements come in."

The trial court denied defendant's motion to suppress her statements, and a recording of the interrogation was played in full for the jury.

## II.   MOTION TO SUPPRESS

### A.   *Standard of Review*

We review the trial court's denial of defendant's motion to suppress, including the question whether defendant was in compelling circumstances when the police interrogated her, for errors of law. *State v. Reed*, 371 Or 478, 488, 538 P3d 195 (2023). We must "determine whether the court's findings of historical fact are supported by constitutionally sufficient evidence in the record, and whether the trial court correctly applied the applicable law." *State v. Courville*, 276 Or App 672, 673, 368 P3d 838 (2016). "In so doing, we presume that the facts were decided in a manner consistent with the court's ultimate conclusion, if the trial court did not make express findings of fact on all pertinent issues, and if the evidence allows for application of that presumption." *Id.* (internal quotation marks omitted).

### B.   *Article I, Section 12, of the Oregon Constitution*

Article I, section 12, of the Oregon Constitution, provides,

> "No person shall be *** compelled in any criminal prosecution to testify against himself."

"To protect a person's right against compelled self-incrimination[,] *** officers must give *Miranda* warnings when a person is in custody or in circumstances that create a setting which judges would and officers should recognize to be compelling." *State v. Nolen*, 333 Or App 376, 380, 552 P3d 741 (2024) (internal quotation marks omitted). "The Article I, section 12, requirement that police officers inform individuals of their rights *** is similar to, but broader than, the requirement under the federal constitution established in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16

L Ed 2d 694 (1966)." *Reed*, 371 Or at 483-84. In particular, those

> "warnings inform individuals that they have the right to remain silent, that anything they say can and will be used against them in a court of law, that they have the right to have an attorney present during the interrogation, and that, if they cannot afford an attorney, one will be appointed for them on request before the interrogation."

*Id.* at 485. When officers do not give *Miranda* warnings "in either of those situations," suppression of any statements made in "response to the unwarned questioning" is required. *State v. Grimm*, 290 Or App 173, 178, 414 P3d 435, *rev den*, 363 Or 283 (2018).

C.  *Compelling Circumstances*

The question whether the circumstances were compelling, requiring the officers to advise defendant of her *Miranda* rights before questioning her, "turns on how a reasonable person in [defendant's] position would have understood *** her situation." *State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007). The ultimate question, considering the totality of circumstances, is "whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id.* at 645-46 (internal quotation marks omitted); *State v. Heise-Fay*, 274 Or App 196, 202-03, 360 P3d 615 (2015). We consider several nonexclusive factors when answering that question, including (1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter. *State v. Roble-Baker*, 340 Or 631, 640-41, 136 P3d 22 (2006). We consider each of those factors as we assess all of the circumstances of the encounter, keeping in mind that "[e]xcept in the most extreme case, no single factor is dispositive." *Heise-Fay*, 274 Or App at 203.

1.  *Location of the encounter*

In general, "when an interview occurs in familiar surroundings, like [the] defendant's residence[,]" we tend to weigh that against a finding that the circumstances of the encounter were compelling. *Id.* We have, however, concluded that a police presence at a suspect's home weighs in favor of a finding of

compelling circumstances where the suspect's home "becomes the location of a significant police operation." *Id.* That was not the factual situation here. And yet as we explain, the interrogation location had some effect on how compelling defendant would have understood her situation to be when considered along with the length of time that the interrogation continued and the amount of pressure that was placed on her by the officers, especially given defendant's underlying mental health condition and limited intellectual capacity.

When the officers introduced themselves, they told defendant that they wanted to speak with her. Defendant allowed the officers in, and they sat with defendant at her dining room table. Once seated, they told her that they wanted to ask her about her former husband. The interrogation focused on the former husband for the first 40 minutes, and then shifted to questions about defendant's own involvement in the abuse. That abrupt shift changed the conversation to one that defendant did not expect, and the dynamics went from cordial to challenging and accusatory.

2.  *Length of the encounter*

The amount of time that passed from the beginning of the police encounter to the end is not, by itself, dispositive of the compelling circumstances question. *State v. Northcutt*, 246 Or App 239, 250, 268 P3d 154 (2011). We consider the length of the police encounter as we evaluate "the use of aggressive and coercive police interrogation practices, especially including *** those explicitly predicated on assumptions of a suspect's guilt or calculated to contradict a suspect's assertions of innocence." *Id.* The amount of significance that we assign to the length of the encounter depends "on the character or quality of the interaction," and we focus our attention "on the qualitative dynamics" of time and the amount of pressure placed on defendant during the encounter as well as her ability to terminate the encounter. *Id.*

The officers questioned defendant well in excess of two hours. They began by focusing on defendant's former husband's criminal conduct. Once defendant was clearly engaged in that conversation, the officers abruptly changed direction and moved to questions about defendant's role in

the abuse. That approach to the interrogation did not involve the use of coercive physical tactics, but the record supports that it involved more nuanced emotional and psychological tactics. The officers chose to interrogation defendant in her home, and they began by asking her to describe the violence and abuse that she suffered at the hands of her former husband. They continued that line of questioning for 40 minutes—a particularly lengthy period of time given the emotionally fraught topic they were covering with defendant. When the officers redirected their questions to defendant's conduct, she continued in the same free-flowing question and answer pattern established during the first 40 minutes.

As the next 90 minutes unfolded, the officers' questions reflected a belief or assumption on their part that defendant had, herself, committed sexual crimes against the children. They expressed skepticism about some of defendant's answers, telling her that she was not a good liar and stating that she should be honest. The officers told defendant that the children had already told them about what she had done. They commented that, unlike her own childhood abuser, she "needed" to take responsibility now in order to help the children heal. In response, defendant made a number of incriminating statements. To be sure, the officers told defendant that she did not have to speak with them—but they did not tell her that until an hour and 58 minutes into the interrogation. Given the nature of the questions asked, the amount of time that the officers spent questioning defendant in her apartment weighs in favor of finding compelling circumstances.

### 3. *Amount of pressure exerted on defendant*

In deciding whether the record supports the trial court's conclusion that defendant was not questioned in constitutionally compelling circumstances, it matters "whether the officers used * * * evidence [of guilt] in a *coercive* manner" when they confronted defendant with that evidence. *Grimm*, 290 Or App at 181 (emphasis in original; internal quotation marks omitted). This case is similar to *Grimm* where the questioning officer told the defendant that the defendant's story was "inconsistent" with the complainant's, that it did not "ma[ke] sense," and that the officer "did not believe [that the defendant] was telling the truth." *Id.* at 176.

Like the officer in *Grimm*, the officers here engaged defendant over a significant period of time in a series of questions in which they repeatedly challenged her truthfulness. They told defendant that the children had shared with them "pretty specific[]" details about what had happened. In so doing, the officers applied pressure on defendant by suggesting that she "ha[dn't] gotten to [all the details]"; that she didn't seem to be giving straight answers; that she just didn't want to speak with them; and that what she said "didn't even make sense." That approach worked to undermine defendant's ability to assert her rights and it also increased the pressure on her to continue answering the questions. That is especially so given defendant's intellectual vulnerability to prolonged, oral questioning. The record does not support the trial court's finding that the interaction between the officers and defendant was "happy" and "relaxed." Indeed, the recorded interrogation includes repeated instances of defendant struggling with her words and lapsing into periods of prolonged hesitation and bursts of crying in response to the escalating pressure of the officers' questions. This factor—the pressure exerted on defendant—weighs in favor of finding compelling circumstances.

4.  *Defendant's ability to terminate the encounter*

The trial court found that defendant "could have told [the officers] to leave" at any time and that she did not do so. The record supports that. "However, the fact that a defendant is free to leave does not necessarily control the outcome." *Id.* at 184. That is especially so where, as here, the officers did not advise defendant that she was free to terminate the interrogation until it was nearly over. *See, e.g.*, *id.* at 184-85 (explaining that the lack of evidence establishing the point during the "relatively long length of the interview" at which the defendant was told that he was free to leave was a significant omission that caused us to conclude that although the fourth factor weighed in favor of the state, "it [did] so only slightly"). The length of the interrogation here was longer than the interrogation in *Grimm*, and the record reflects that defendant was not advised that she could terminate the interrogation until close to its end. And by that time, defendant had already become entrenched in the lengthy interrogation.

And, as already discussed, defendant was vulnerable to prolonged, oral questioning and was apt to give answers that "pass" without attempting to clarify what was being asked of her. The very nature of the interrogation, including the manner and place in which it was carried out, made it a difficult encounter to terminate. We cannot say that a reasonable person in defendant's position, at the point when the focus switched to her conduct, would have continued to understand that she was under no obligation to continue answering the questions. We, thus, conclude that the fourth factor weighs slightly in favor of finding compelling circumstances.

5. *The factors considered together and harmlessness*

The interplay of all four factors is important and the synergistic effect of location, time, pressure, and ability to terminate the interrogation reflected in this record highlights the importance of assessing the totality of the circumstances over any isolated factor. On balance, we conclude that the circumstances of the police interrogation became constitutionally compelling 40 minutes into the interrogation and that they required the officers to advise defendant of her *Miranda* rights before proceeding at that point. The trial court erred in concluding otherwise.

Further, that error was not harmless. The interrogation was extensive, and defendant's statements were incriminating. The state relied heavily on the recorded interrogation, referring to it in both its opening statement and its closing argument. The recorded interrogation was played in its entirety to the jury. We cannot say that there is little likelihood that the trial court's errant evidentiary ruling had an impact on the verdict. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (explaining that an erroneous admission of evidence is harmless if "there is little likelihood that the error affected the verdict").

### III.  DURESS JURY INSTRUCTION

A.  *Standard of Review*

We review a trial court's denial of a requested jury instruction for legal error, evaluating the record in the light most favorable to the requesting party. *State v. Paul*, 289 Or

App 408, 409, 410 P3d 378 (2017). It is reversible error for a jury instruction to "create[] an erroneous impression of the law in the minds of the jur[ors]" so as to affect the verdict. *State v. Poitra*, 261 Or App 818, 820, 323 P3d 563 (2014) (second bracket in original).

B.  *Analysis*

Defendant raised a duress defense under ORS 161.270.[4] Her theory was that she engaged in sexual contact with the children because her former husband forced her to do so. The parties and the trial court agreed that the duress instruction would be appropriate, but there was disagreement on the language of the instruction itself. The uniform instruction, requested by defendant, provides:

> "The defense of duress has been raised.
>
> "The commission of acts that would otherwise constitute an offense is not criminal if the person engaged in the conduct because the person was coerced. The coercion must be by the use or threatened use of unlawful physical force on the person or on some other person. The force or threatened force must be of such a nature or degree as to overcome earnest resistance.
>
> "Duress is not a defense if a person has intentionally or recklessly placed herself in a situation in which it is probable that she will be subjected to duress.
>
> "The threatened harm must be present, imminent, and impending.
>
> "The state must prove beyond a reasonable doubt that the defendant did not act under duress."

---

[4] ORS 161.270 provides:

"(1) The commission of acts which would otherwise constitute an offense, other than murder, is not criminal if the actor engaged in the proscribed conduct because the actor was coerced to do so by the use or threatened use of unlawful physical force upon the actor or a third person, which force or threatened force was of such nature or degree to overcome earnest resistance.

"(2) Duress is not a defense for one who intentionally or recklessly places oneself in a situation in which it is probable that one will be subjected to duress.

"(3) It is not a defense that a spouse acted on the command of the other spouse, unless the spouse acted under such coercion as would establish a defense under subsection (1) of this section."

UCrJI 1104. The state requested that the court add the sentence, "The threat of a future injury is not sufficient to constitute duress" before the sentence that says, "The danger must be present, imminent, and impending." Defendant objected to the requested sentence and clarified that she was "asking for the routine duress instruction," which does not include the sentence about the "threat of future injury." The court overruled defendant's objection and gave the uniform instruction with the state's requested additional language.

A defendant may rely on duress as a defense to a crime other than murder "if the actor was coerced to [commit the crime] by the use or threatened use of unlawful physical force upon the actor or a third person." ORS 161.270(1). Whether a defendant is entitled to have the jury instructed on duress depends on the requirements provided for in ORS 161.270. *State v. Boldt*, 116 Or App 480, 483, 841 P2d 1196 (1992). As mentioned, the parties agreed that such an instruction was appropriate here. The question concerns the additional sentence requested by the state and given to the jury.

The threat of future injury may be sufficient to constitute duress under ORS 161.270 if the danger that such injury will occur is "'present, imminent, and impending.'" *Boldt*, 116 Or App at 483 (quoting *State v. Fitzgerald*, 14 Or App 361, 371, 513 P2d 817 (1973)). A "vague threat of future injury [is] insufficient to justify a duress instruction, due to the lack of imminency." *Boldt*, 116 Or App at 484 (citing *Fitzgerald*, 14 Or App at 371, where we explained that the defendant did not act under duress when attempting to escape from jail because being told that an accomplice had friends on the outside that could take care of him presented only a vague threat of future injury). "[I]mminent" means that "the threat must exist at the time of the commission of the charged offense," *Boldt*, 116 Or at 483-84, but the *injury itself* need not be imminent, *Paul*, 289 Or App at 413.

We concluded in *Boldt* that the defendant faced an *imminent* threat of future injury when he was warned that "some bad things were going to happen" to him "if [he] didn't leave town." *Boldt*, 116 Or App at 482. We reached that conclusion because the threat existed on the day the defendant

was scheduled to appear in court and because it was conditioned on what the defendant would do on that date. *Id.* at 484. We reached a similar conclusion in *Paul*, where the defendant was told by his girlfriend's uncle that if he did not drive his girlfriend's mother to a home to burglarize it, something would "happen to [the defendant's] daughter." *Paul*, 289 Or App at 409-10. The mother had previously met defendant's daughter, she knew where the daughter lived, and the defendant had heard that the uncle was a "dangerous guy" who "had been to prison." *Id.* at 410, 411. Because the threat existed when the defendant decided to aid in the burglary and because the threat was conditioned on the defendant's choice to participate, we determined that the threat of future injury was imminent. *Id.* at 413.

By adding "the threat of a future injury is not sufficient to constitute duress" to the uniform duress instruction, the trial court misstated the law because duress *may be* based upon the threat of future injury if the future injury that is threatened is imminent.

In asking us to affirm, the state argues that a pattern of past abuse may amount only to a "nonspecific threat of future harm." We reject that argument: The evidence before the jury permitted it to find that defendant's former husband raped and assaulted defendant on a regular basis when she refused to engage in certain sexual acts, that she shared a bedroom with her former husband in a shared house throughout the time period when the children were being abused, and that the children observed defendant's former husband "force" her to participate in the abuse. A reasonable inference that defendant acted under threat of imminent future injury existed on that record, and a jury would have been entitled to so conclude. We, therefore, conclude that the additional language added to the duress instruction by the trial court would have had the prejudicial effect of suggesting to the jury that they could not reach that permissible conclusion, effectively removing the duress defense from the case.

Reversed and remanded.