No. 557　　　　　June 17, 2026　　　　　689

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

FREDDIE LARAY CRAWFORD,
*Defendant-Appellant.*

Hood River County Circuit Court
21CR44785; A179833

Robert S. Raschio, Judge.

Argued and submitted September 27, 2024.

Daniel C. Silberman, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Hellman, Judge, and O'Connor, Judge.*

O'CONNOR, J.

Reversed and remanded.

_____
　* O'Connor, J. *vice* Mooney, S. J.

**O'CONNOR, J.**

In this criminal case, defendant challenges the trial court's denial of his motion to suppress evidence. The question before us is whether defendant was in compelling circumstances under Article I, section 12, of the Oregon Constitution, prior to being advised of his right to remain silent and his right to counsel during a police interrogation. Under the totality of the circumstances of this case, the roadside traffic collision investigation escalated into compelling circumstances prior to the officer advising defendant of his rights. The trial court thus erred when it denied the motion to suppress. We reverse and remand because the error was not harmless.

The state charged defendant with driving under the influence of intoxicants (DUII), ORS 813.010; reckless driving, ORS 811.140; and failure to perform the duties of driver when property is damaged, ORS 811.700. Defendant moved to suppress evidence, and the trial court granted the motion in part and denied it in part. Defendant proceeded to a jury trial. The court entered a judgment of acquittal on the charge of failure to perform the duties of driver. The jury found defendant not guilty of DUII and guilty of reckless driving.

Defendant appeals the judgment of conviction for reckless driving. He assigns error to the trial court's denial of his motion to suppress, renewing three arguments that he raised in the trial court. We write to address only the compelling circumstances issue because that obviates the need to resolve the other two arguments.[1] The trial court

---

[1] Defendant's second argument involves whether the trial court erred when it analyzed whether the evidence obtained in a warranted search should have been suppressed as a result of a separate Article I, section 12, violation under *State v. Rohrs*, 157 Or App 494, 970 P2d 262 (1998), *aff'd*, 333 Or 397, 40 P3d 505 (2002). The Article I, section 12, compelling circumstances violation requires the suppression of the evidence obtained from the warrant, as we explain below, and we thus do not separately address the remedy for the *Rohrs* violation.

In his third argument, defendant challenges the officer's search of his car incident to arrest as violating his rights under Article I, section 9, of the Oregon Constitution. Defendant acknowledges that his argument is foreclosed by *State v. Stevens*, 329 Or App 118, 540 P3d 50 (2023), *rev den*, 372 Or 437 (2024). He maintains that *Stevens* was wrongly decided and notes that the issue is pending before the Supreme Court in *State v. Barajas* (S071120). If we were to reach that issue, then *Stevens* would control. But we do not reach the issue because the evidence obtained from the officer's search of defendant's car must be suppressed because of the Article I, section 12, violation, as we explain below.

concluded that defendant was not in compelling circumstances and that *Miranda* warnings were thus not required prior to the point at which the officer arrested defendant and provided the *Miranda* warnings. Defendant argues that an Oregon State Police trooper interrogated him while he was in compelling circumstances without first advising him of the *Miranda* rights,[2] in violation of Article I, section 12. The state responds that the trial court correctly determined that defendant was not in compelling circumstances. We conclude that a reasonable person in defendant's circumstances would have felt compelled to answer the officer's questions prior to the point at which the officer arrested defendant and provided defendant with *Miranda* warnings.

## I.   STANDARD OF REVIEW

We are bound by the trial court's findings of fact "if there is constitutionally sufficient evidence in the record to support those findings." *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). If the trial court did not make express fact findings on a fact necessary to its decision "and there is evidence from which a fact could be decided in more than one way, we presume that the trial court decided the fact in a manner that was consistent with the trial court's ruling." *State v. Miller*, 375 Or 173, 176, 589 P3d 151 (2026). We then review a trial court's denial of a motion to suppress for legal error, and "assess anew" whether the facts meet the requirements of Article I, section 12. *Id*.

## II.   FACTS

Whether a person was in compelling circumstances requires a fact-intensive analysis of the totality of the circumstances. *State v. Grimm*, 290 Or App 173, 178, 414 P3d 435, *rev den*, 363 Or 283 (2018). We thus describe the facts in detail.

---

[2] "*Miranda* rights" refers to the advice of rights required under the Fifth Amendment to the United States Constitution as explained in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). Article I, section 12, independently requires *Miranda* warnings or similar warnings when a person is in custody or compelling circumstances. *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987). The Oregon Supreme Court refers to the rights under both constitutions as *Miranda* rights, for ease of reference, and we follow suit. *State v. Roble-Baker*, 340 Or 631, 633 n 1, 136 P3d 22 (2006).

The state called a single witness to testify at the hearing on defendant's motion to suppress, Oregon State Police Trooper Ferrer. The court admitted four exhibits offered by the state: (1) Ferrer's body camera video, (2) dash camera video from Ferrer's patrol car, (3) photos from the scene, and (4) an affidavit for a search warrant for defendant's blood and urine. Defendant did not present evidence at the hearing. Nearly all of the encounter between Ferrer and defendant was video recorded, and the parties did not seriously dispute the facts.

Late in the afternoon on a sunny day in early September, an eyewitness, Evans, reported a single-car crash to the police in Hood River County. Evans said that a man driving a dark sedan with no one else in the vehicle had hit the center barrier on Interstate 84, threw a beer can in a paper bag out of the window, and continued driving for about a mile before the car failed. Evans provided the car's license plate number and said the car had significant damage to the driver's side and could no longer be driven.

Ferrer responded and drove to the scene. On the way, Ferrer noticed a scuff on the center barrier and that the barrier had been "pushed slightly" from an impact. Not far from there, Ferrer saw a damaged car on the side of the highway. The car had significant damage on the driver's side, including deflated tires and scuff marks consistent with striking the center barrier. The license plate matched the plate number provided by Evans.

A uniformed sheriff's deputy had arrived a few minutes prior to Ferrer. The deputy parked his patrol car on the side of the highway with its overhead lights activated, behind another car and defendant's car. The other car belonged to defendant's parents. The deputy was speaking with defendant and his father and examining defendant's car when Ferrer arrived. Defendant's mother was sitting in the passenger seat of her car. The deputy approached Ferrer and the deputy told Ferrer that defendant said that "they" blew a tire and pulled up about 30 minutes ago.

Ferrer approached defendant, who had walked back to his parents' car, and asked defendant if he had been

driving the car. Defendant said that he owned the car and that nobody had been driving. Ferrer laughed and asked, "How did it get here?" Defendant said his girlfriend had driven it the day before and she had blown out a tire. Ferrer expressed disbelief and responded that he "was here yesterday" and had not seen the car. Defendant repeated that his girlfriend had driven the car yesterday and said that she had blown a tire. Ferrer asked defendant for his driver's license. Defendant asked why, and this exchange followed:

"[TROOPER FERRER:] Because at this point, I'm investigating a crash, and we have a witness who witnessed the crash and I believe that you were driving at this point.

"[DEFENDANT:] Just because you believe it—

"[FERRER:] Like I said, we have a witness that witnessed the crash.

"[DEFENDANT:] Can you bring that witness here then?

"[FERRER:] I can certainly talk with them again. Okay? But right now, I'd like your driver's license and you are not free to leave.

"[DEFENDANT:] I'm not going anywhere. What I am saying is, basically, I am being detained right now?

"[FERRER:] Yes.

"[DEFENDANT:] Okay. [Defendant removes his license from his wallet and hands it to Ferrer.] Can you also bring that witness here?

"[FERRER:] I can't make them come anywhere but I can certainly talk to them.

"[DEFENDANT:] But you just said there is witness that spoke—

"[FERRER:] Yeah, on the telephone.[3]

Ferrer then said, "Let's walk up here to the car, okay?" Defendant and Ferrer walked to defendant's car, which was parked approximately 10 to 20 feet in front of his parents' car. Defendant's father stood in front of his car,

---

[3] The quotations are based on our transcription of the audio from Ferrer's body camera video.

and his mother remained in the passenger seat. The deputy stood at the back of defendant's car, positioning himself between defendant's parents, defendant, and Ferrer.

Ferrer held his hand over the hood of the car and said to defendant, "Bro this thing's been running. This thing's been moving. It's not just parked here since yesterday." Defendant responded that he was not trying to give Ferrer a "hard time," but "you're not going to tell me I've been driving when I know I haven't. The sun is right here beaming. It could be hot, it could be anything. I'm not going to sit here and let you say I have been driving—." Ferrer interrupted him and asked, "How much have you had to drink today, sir?" Defendant responded that he had not been drinking. Ferrer told defendant that a beer can had been thrown out when the crash occurred. Defendant asked if Ferrer was going to blame that on him also. Ferrer responded that the witness saw him throw it out and that "we can make this easy or hard, it's totally up to you whether you're going to be honest or not." Defendant responded that he was trying to be as honest as he could and again said that he was not trying to give the officer a hard time, but he was not going to let him accuse him of something he had not done.

Ferrer then asked defendant if he would "do some tests just to make sure you are okay today." Defendant expressed frustration and said he was trying to make it back to Portland because he had to go to work soon. Ferrer asked, "Why are you drinking before you go to work then?" Defendant did not respond. Ferrer said, "Look, I can smell alcohol on your breath, it's very obvious." Defendant responded that he was trying to get to work and that he was willing to cooperate with Ferrer. Ferrer said, "So you're willing to do some tests then, is that correct?" Defendant said, "Okay, I have been drinking yesterday, is that going to make me guilty?" Defendant and Ferrer briefly talked over each other, and defendant said, "No, I'm not gonna. I refuse, sir." Ferrer said, "Okay. Well, at this time I'm going to put you under arrest." He handcuffed defendant and informed him of the *Miranda* rights, and defendant indicated that he understood. Ferrer placed defendant in the backseat of his patrol car.

Ferrer then spoke with defendant's father, who said that he came from Portland to help defendant get a new tire because defendant had called and said he had blown a tire. Ferrer spoke with defendant's mother. She confirmed what defendant's father had said.

Ferrer searched defendant's car. He found a lighter on the driver's seat and eye drops and a small amount of loose marijuana in the center console, and he smelled alcohol and freshly burnt marijuana.

Ferrer returned to the patrol car. Defendant asked him to turn on the air conditioning. Ferrer told defendant that the air conditioning was broken, apologized, and rolled down the window. Defendant said that he had not broken any laws and that he did not understand why he was being arrested. He asked where the witness was who said he had been driving. Ferrer explained that defendant's parents said they drove here to pick up defendant. Defendant said "no." Ferrer said, "They did tell me that. They said you'd called them because you claimed that you blew a tire." Defendant said, "Exactly, they gave me a ride here." Ferrer said that was not what defendant's parents had told him. Ferrer said he did not want to "play games" with defendant and again repeated what Evans had reported. Ferrer told defendant that he had "obviously" been drinking and driving. Ferrer and defendant discussed defendant's parents moving defendant's car instead of it being towed. Ferrer told defendant's parents that he would allow them to move the car to save defendant money. He also explained that he would release defendant to his parents' custody later that evening.

Ferrer drove defendant to a police station in Hood River. The drive took about 20 minutes, and defendant dozed for a portion of the drive. At the station, Ferrer asked defendant to submit to a breath test. Defendant said he was concerned that he would fail because he had been drinking a lot with his girlfriend the night before and he was a smoker. Ferrer told defendant that being a smoker does not prevent a person from providing a breath sample. Defendant refused to submit to a breathalyzer test. Ferrer placed defendant in a holding cell.

Ferrer prepared an affidavit in support of a request for a search warrant to obtain defendant's blood and urine to test them for intoxicants. In the affidavit, Ferrer wrote that he had probable cause that defendant committed DUII because of poor driving, poor walking and balance, "slurred speech that smelled of alcohol," watery eyes, defendant's refusal to perform field sobriety tests (FSTs), defendant's refusal to perform the breath test, defendant's admission to drinking heavily the previous night, and because his car "smelled strongly of alcohol and burnt marijuana." A judge issued the search warrant. Three hours after defendant refused the breathalyzer test, the blood draw revealed a 0.012 blood alcohol content (BAC). The urine sample tested positive for marijuana use. At trial, an expert testified that the urine test result showed only that defendant had used marijuana sometime during the previous 30 days.

The deputy found a beer can on the highway, near where defendant's car struck the center barrier. The can was similar in color to Evans's description of the beer can that she saw the driver throw out of the car's window, but it did not have a paper bag around it or near it.

As noted above, the state charged defendant with DUII, reckless driving, and failure to perform the duties of a driver. Pretrial, defendant moved to suppress "all physical evidence seized and gathered from [defendant's] vehicle, all in and out of custody statements of the defendant, and all evidence deriving therefrom." Defendant's motion identified specific evidence that should be excluded, consistent with defendant's arguments on appeal.

The trial court granted the motion in part and denied it in part. The court determined that Ferrer had violated defendant's Article I, section 12, privilege against compelled self-incrimination when he asked defendant to perform FSTs without providing the *Rohrs* admonishment. The court denied the remainder of defendant's motion. It determined that defendant was not in custody or compelling circumstances prior to Ferrer providing the *Miranda* warnings and that Ferrer's search of defendant's car was justified by the search-incident-to-arrest exception to the warrant requirement. The court suppressed defendant's

refusal to perform the FSTs, but it did not suppress any other evidence. As noted above, defendant challenges all three rulings on appeal, but we reach only the compelling circumstances ruling.

### III.   ANALYSIS

A.   *Article I, section 12, Compelling Circumstances*

Article I, section 12, of the Oregon Constitution provides that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself." *Miranda* warnings protect a defendant's Article I, section 12, right against compelled self-incrimination. *State v. Rodriguez*, 337 Or App 728, 734, 564 P3d 471 (2025). That right is "similar to, but broader than," a defendant's Fifth Amendment right against self-incrimination, as established in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). *State v. Reed*, 371 Or 478, 483-84, 538 P3d 195 (2023). Article I, section 12, requires a law enforcement officer to provide a person with *Miranda* warnings or *Miranda*-like warnings when a defendant is in full custody or compelling circumstances. *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006); *State v. Schwerbel*, 233 Or App 391, 395, 226 P3d 100, *rev den*, 349 Or 172 (2010) (explaining that "full custody" means when a suspect "has been formally arrested or placed under restraint by police acting in their official capacity" (internal quotation marks omitted)). That is, to protect a person's privilege against compelled self-incrimination, Article I, section 12, requires *Miranda* warnings or *Miranda*-like warnings when law enforcement interrogates a person who is not in custody when the circumstances become compelling.

When a defendant moves to suppress their own statement, the state must prove by a preponderance of the evidence that the statement was voluntary, including that any "unwarned statements were made before the circumstances became compelling." *Roble-Baker*, 340 Or at 639. "The question whether the circumstances were compelling *** turns on how a reasonable person in the suspect's position would have understood [their] situation." *State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007). We consider the

totality of the circumstances and ask whether law enforcement created a "police-dominated atmosphere," using a nonexclusive list of factors, including: "(1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter." *Rodriguez*, 337 Or App at 735 (citing *Shaff*, 343 Or at 645, and *Roble-Baker*, 340 Or at 640-41). "We consider each of those factors as we assess all of the circumstances of the encounter, keeping in mind that except in the most extreme cases, no single factor is dispositive." *Rodriguez*, 337 Or App at 735 (internal brackets and quotation marks omitted).

The purpose of advising a person of their *Miranda* rights is to "counter the coercive effects inherent in custodial interrogations." *Miller*, 375 Or at 183 (internal quotation marks omitted). The *Miranda* warnings, which include the right to remain silent and the right to counsel during interrogation, help "counteract" the coercive atmosphere, thus increasing the likelihood that a statement made in custody or compelling circumstances "is the product of free choice." *Id*. (internal quotation marks omitted). An officer must advise a person of their rights before interrogating a person in custody or compelling circumstances "because the right to be free from compelled self-incrimination is fulfilled only when the person is guaranteed the right to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Id*. (internal quotation marks omitted).

Defendant asserts that he was subject to interrogation while in compelling circumstances and without receiving *Miranda* warnings. The state counters that defendant was not in compelling circumstances because the encounter was a routine traffic stop or typical DUII investigation. *See State v. Nelson*, 285 Or App 345, 351, 397 P3d 536 (2017) (explaining that a traffic stop or an investigatory detention does not require *Miranda* warnings "so long as the stop is no more lengthy or coercive than is typical"); *State v. Prickett*, 324 Or 489, 494-95, 930 P2d 221 (1997) (administering FSTs does not, by itself, constitute compelling circumstances).

"Routine" traffic stops can escalate into compelling circumstances. *See Schwerbel*, 233 Or App at 395-98

(concluding that the officer's routine traffic stop of the defendant for driving with an unsafe vehicle became compelling circumstances and required *Miranda* warnings once the officer suspected the defendant of driving with a suspended license after running the defendant's identification and detaining him); *State v. McMillan*, 184 Or App 63, 68-69, 55 P3d 537 (2002), *rev den*, 335 Or App 355 (2003) (concluding that the officer's statement to the defendant during a stop that a second officer will "come back and make a decision as to whether or not [the defendant was] going to jail" and the fact that the officer confronted the defendant with his observation that the defendant retrieved cash from an ATM machine and immediately engaged in sexual activity with a prostitute in his car escalated the stop to compelling circumstances); *State v. Rose*, 109 Or App 378, 380-81, 819 P2d 757 (1991) (concluding that an officer who asked the defendant if she knew that carrying a concealed weapon in a car without a permit is illegal placed the defendant in compelling circumstances after he had stopped the defendant for erratic driving and subsequently saw she had an empty holster, asked her if there was a weapon in the car, and asked her to exit the vehicle). When evaluating whether a traffic stop has become compelling, we consider, among the totality of the circumstances, whether the officer confronted the defendant with incriminating evidence in a coercive manner that would cause a reasonable person in the defendant's position to feel compelled to answer their questions. *Schwerbel*, 233 Or App at 395-96.

1. *Location*

A traffic stop on a public roadway is less likely to contribute to a compelling atmosphere than a police-dominated atmosphere like a police station. *Compare Prickett*, 324 Or at 495 (describing a noncompelling traffic stop as "public," "brief," and not "coerc[ive] or threaten[ing]"), *with Grimm*, 290 Or App at 180 ("[T]he unfamiliar, police station setting of the interview tended—necessarily—toward a 'police dominated atmosphere.'").

Here, Ferrer and defendant interacted on the shoulder of a busy public highway during the late afternoon. Two police officers, Ferrer and a sheriff's deputy, were present.

The deputy does not appear to have engaged with defendant while Ferrer was speaking with him.

Defendant's parents were also present. His parents remained with their car for the majority of the encounter. Ferrer went back and forth between defendant and his parents and was respectful when talking with them. But the officer exerted control over when defendant could interact with his parents. On the whole, we conclude that the location of the encounter, including the people present, weighs against compelling circumstances. *See State v. Gallegos-Torres*, 343 Or App 65, 68, 577 P3d 822 (2025) (an encounter in a public location weighs against finding compelling circumstances).

   2.  *Length*

Here, a few minutes elapsed between Ferrer's first question to defendant and when Ferrer arrested defendant and provided *Miranda* warnings. However, the length of an encounter is not dispositive. *Rodriguez*, 337 Or App at 736. Even a short encounter may result in compelling circumstances depending on other circumstances, including "the amount of pressure placed on [the] defendant during the encounter as well as [their] ability to terminate the encounter." *Id*. It was a relatively brief encounter here, and the length weighs against concluding that the circumstances were compelling. *See Gallegos-Torres*, 343 Or App at 68 (concluding that a 10-minute-long encounter in a public location weighed against finding compelling circumstances).

   3.  *The amount of pressure exerted on defendant*

Even a brief encounter can become compelling under Article I, section 12. "The amount of significance we assign to the length of the encounter depends *** on the qualitative dynamics of time and the amount of pressure placed on defendant during the encounter as well as [his] ability to terminate[.]" *Rodriguez*, 337 Or App at 736 (internal quotation marks omitted). We consider "the use of aggressive and coercive police interrogation practices, especially including those explicitly predicated on assumptions of a suspect's guilt or calculated to contradict a suspect's assertions of innocence" to be more significant for our

analysis of how a defendant understood their situation than the objective length of time. *Id.* (internal quotation marks and punctuation omitted)).

In many police-citizen encounters, the most significant factor for evaluating the amount of pressure put on a defendant is "whether the officer[] used evidence of guilt in a *coercive* manner when they confronted defendant with that evidence." *Rodriguez*, 337 Or App at 737 (internal quotation marks, brackets, and punctuation omitted; emphasis in original). Specifically, we have concluded that an officer "expressly confronting a suspect with evidence of probable cause * * * may make the circumstances sufficiently compelling to require *Miranda* warnings." *McMillan*, 184 Or App at 68; *see also State v. Werowinski*, 179 Or App 522, 532, 40 P3d 545, *rev den*, 334 Or 632 (2002) (explaining that confronting the defendant with witness statements that incriminated the defendant would have made a reasonable person in the defendant's situation understand that he was being questioned in compelling circumstances). For example, an officer's statement that they believe a defendant had been driving impaired, without more, "would not be understood by a reasonable person to be pressure on [them] to answer questions." *Nelson*, 285 Or App at 354. By contrast, informing a defendant that the officer will decide whether to take the defendant to jail and then confronting the defendant with evidence that the defendant solicited a sex worker weighs in favor of compelling circumstances. *McMillan*, 184 Or App at 68-69.

Here, the coercive nature of the encounter escalated quickly as Ferrer increased the pressure on defendant. Within 40 seconds of engaging defendant, Ferrer told defendant that a witness had observed a car crash and that Ferrer believed defendant was driving the car, despite defendant's statements denying that he had driven the car. A little less than two minutes after engaging defendant, Ferrer asked defendant how much he had to drink that day and defendant denied drinking at all that day. Ferrer told defendant that a witness had seen him throw a beer can out of the window and that "we can make this easy or hard, it's totally up to you whether you're going to be honest or not." A reasonable person in defendant's circumstances would have understood Ferrer

to have communicated that Ferrer believed defendant was lying about drinking and driving and, if defendant did not tell Ferrer the truth (that is, admit to drinking and driving), then Ferrer would make this "hard" for defendant. Thus, the intensity of the encounter quickly escalated even though the duration was short. Accordingly, this factor weighs in favor of finding compelling circumstances.

4. *Defendant's ability to terminate the encounter*

A defendant's inability to terminate an encounter during a traffic stop or relatively brief investigative stop to investigate a crime "does not usually result in compelling circumstances" by itself. *Gallegos-Torres*, 343 Or App at 69. When an officer expressly informs a defendant that they are "detained," however, that weighs in favor of finding compelling circumstances. *Compare Schwerbel*, 233 Or App at 397 (officer telling the defendant he was detained weighed in favor of compelling circumstances), *with State v. Revette*, 318 Or App 749, 763, 508 P3d 985, *rev den*, 370 Or 214 (2022) (explaining that an officer informing the defendant that he was free to leave no matter what the defendant told the officer weighs against finding compelling circumstances).

Here, two law enforcement officers in patrol cars were present. Ferrer told defendant that he was investigating a crash and asked for defendant's identification. Defendant asked whether he was being detained. Ferrer told him he was detained. Immediately thereafter, Ferrer repeatedly confronted defendant with Evans's report and communicated to defendant that he did not believe defendant's story. Defendant was obviously not free to leave. Ferrer taking defendant's driver's license and telling him he was detained did not elevate the encounter to compelling circumstances on its own, but it significantly heightened the intensity of the encounter and the pressure that would have been felt by a reasonable person in defendant's circumstances.

5. *Totality of the circumstances*

"The interplay of all four factors is important and the synergistic effect of location, time, pressure, and ability to terminate the interrogation reflected in this record highlights the importance of assessing the totality of the

circumstances over any isolated factor." *Rodriguez*, 337 Or App at 739. Under the totality of the circumstances in this case, defendant was in compelling circumstances under Article I, section 12, when the officer told defendant that a witness had seen him throw a beer can out of the window and told defendant that "we can make this easy or hard, it's totally up to you whether you're going to be honest or not."

Prior to that point, the circumstances had escalated quickly from a noncoercive crash investigation to compelling circumstances. From the start of the encounter, Ferrer clearly communicated that he believed defendant was lying to him about how the crash occurred. Ferrer then directed defendant's movement away from his parents to defendant's car, where he confronted defendant with physical evidence that contradicted defendant's statements that he had not driven the car that day. The uniformed deputy placed himself between defendant, Ferrer, and defendant's parents. Ferrer informed defendant that he was detained and not free to leave. Ferrer continued to tell defendant that he did not believe his statements, and to confront defendant with evidence that contradicted defendant's claim that he had driven. When defendant protested that he was telling the truth, Ferrer abruptly asked "how much" he had to drink that day. That question assumed that defendant had been drinking, and circumstances of the encounter to that point made it clear that Ferrer believed defendant had been drinking and driving. Defendant denied drinking. Ferrer immediately responded by telling defendant that a witness had seen him throw a beer can out of the car's window. Defendant responded by asking if Ferrer was going to blame that on him also. Ferrer then told defendant that the witness saw him do it and told defendant that "we can make this easy or hard, it's totally up to you whether you're going to be honest or not."

At that point, a reasonable person in defendant's position would have understood that if they were not honest, which Ferrer had communicated meant admitting to drinking and driving, then the remainder of the encounter would be "hard." *See Schwerbel*, 233 Or App at 395 ("Although an officer's unarticulated suspicions do not

result in compelling circumstances, expressly confronting a suspect with evidence of probable cause to arrest may make the circumstances sufficiently compelling to require *Miranda* warnings[.]" (Citing *McMillan*, 184 Or App at 68.)). A reasonable person would have felt compelled to respond to Ferrer's accusation to avoid making the rest of the encounter "hard." *See State v. Courville*, 276 Or App 672, 678, 368 P3d 838 (2016) (recognizing that the United States Supreme Court in *Miranda* explained that questioning that projects an "aura of confidence" in a person's guilt "undermines [the person's] will to resist" answering the questions (quoting *Miranda*, 384 US at 455)); *see also Roble-Baker*, 340 Or at 643 n 8 (citing *Miranda* for the same proposition). The coercive effect on defendant tipped the balance of the encounter to compelling circumstances. *See Reed*, 371 Or at 484 (explaining that the purpose of requiring *Miranda* warnings under Article I, section 12, is to "counter the coercive effects inherent in custodial interrogations" and circumstances that have become compelling). *Miranda* warnings were required to counteract the coercive effect and to ensure that defendant's subsequent statements were the product of his free will. *See Miller*, 375 Or at 183. This case illustrates the danger of not providing the warnings. It was only after the officer told defendant that "we can make this easy or hard, it's totally up to you whether you're going to be honest or not," that defendant admitted to drinking alcohol, claiming that he had done so the night before, even though he had denied drinking alcohol multiple times earlier in the encounter.

## B.   *Remedy for Article I, section 12, Violation*

"The state bears the burden of production and persuasion to show" that subsequently obtained evidence did not derive from an Article I, section 12, violation. *State v. Swan*, 363 Or 121, 133, 420 P3d 9 (2018). Physical and testimonial evidence derived from a violation of Article I, section 12, may not be used against a defendant in a criminal prosecution. *State v. Vondehn*, 348 Or 462, 476, 236 P3d 691 (2010). A court must "suppress not only a defendant's statements obtained in violation of *Miranda* but also evidence derived from that violation." *State v. Jarnagin*, 351 Or 703,

715-16, 277 P3d 535 (2012). "[T]he question whether testi-monial or physical evidence derives from a prior *Miranda* violation cannot be reduced to a mechanical formula but will vary depending on the totality of the circumstances." *Swan*, 363 Or at 131. The totality of the circumstances inquiry involves looking at the *Jarnagin* factors, which are

> "the nature of the violation, the amount of time between the violation and any later statements, whether the suspect remained in custody before making any later statements, subsequent events that may have dissipated the taint of the earlier violation, and the use that the state has made of the unwarned statements."

*Jarnagin*, 351 Or at 716.

Similarly, a defendant seeking to "exclude evidence obtained in a warranted search must establish a minimal factual connection between the illegality asserted as a basis for suppression and the challenged evidence." *State v. DeJong*, 368 Or 640, 654, 497 P3d 710 (2021). A defendant's burden to show a "minimal factual nexus" is low; it "does not require a defendant to identify and produce evidence related to discrete factual theories connecting unlawful conduct with the challenged evidence." *Id.* at 655. A defendant can show a minimal factual nexus if the evidence that was obtained is connected to "some prior governmental misconduct." *State v. Johnson*, 335 Or 511, 521, 73 P3d 282 (2003).

When a defendant shows a minimal factual nexus between evidence and an earlier constitutional violation, the burden shifts to the state to demonstrate that the evidence "would have been inevitably discovered, *** discovered through independent means, or *** so attenuated from the illegality as to dissipate the taint[.]" *Id.* at 520; *see also State v. Yaeger*, 321 Or App 543, 545, 517 P3d 1029 (2022), *rev den*, 371 Or 477 (2023). "[I]t is not sufficient for the state merely to show that the warrant application was sufficient without the tainted evidence. The state must show that the *challenged evidence would have been discovered* during the warranted search even without the prior illegality." *Yaeger*, 321 Or App at 548 (emphasis in original). For example, "[e]ven when a *Miranda* violation has occurred," subsequent conduct, circumstances, or events can "break the causal

chain" if the subsequent conduct, circumstances, or events were "either not affected by or w[ere] only tenuously connected to a prior illegality." *State v. Williams*, 320 Or App 705, 715, 514 P3d 501 (2022) (analyzing whether the defendant's voluntary consent was sufficient to "attenuate [the] prior violation" of *Miranda* (internal quotation marks omitted)). Ultimately, this is a factually intensive inquiry, and "[t]here is a range of circumstances that can affect whether subsequently discovered evidence derives from the failure to give required *Miranda* warnings." *Id.* at 722 (internal quotation marks omitted).

*DeJong* implicitly overruled our cases that had approved of a trial court simply excising the evidence derived from the constitutional violation from a warrant and then evaluating whether the affidavit in support of the request for the warrant provided probable cause without the excised evidence. *Id*. *DeJong* involved a violation of the defendant's Article I, section 9, rights. 368 Or at 642. In *Yaeger*, we applied the *DeJong* analysis to a warranted search that followed an Article I, section 12, violation. 321 Or App at 547-50.

In this case, defendant asks us to determine which evidence derived from the violation by applying the test from *Jarnagin* and to conclude that the *Miranda* violation requires suppression of all subsequently discovered evidence, including the evidence in defendant's car and the blood test and urine test results. He argues that the subsequent events, including the belated *Miranda* warnings and the judge's issuance of the warrant for his blood and urine, did not dissipate the taint from the Article I, section 12, violation, and he notes that the state did not attempt to establish attenuation in the trial court. The state does not respond to the merits of those arguments. Instead, it argues in a footnote that the prosecutor "likely" did not advance any attenuation arguments because defendant did not argue below that the trial court should suppress the evidence in his car or the results of the blood or urine tests as a result of the *Miranda* violation. We disagree that defendant did not raise the issue below.

Defendant filed a single motion to suppress, argued that his statements "were coerced under compelling

circumstances," and asked the court to "suppress all physical evidence seized and gathered from [defendant's] vehicle, all in and out of custody statements of [ ] defendant, and all evidence deriving therefrom." To be sure, the motion also cited other constitutional provisions, and it could have been more precise. But the motion was adequate to place the state and the court on notice that defendant sought to suppress all physical and testimonial evidence obtained after the point at which the encounter became compelling under Article I, section 12.

On the merits, defendant established a minimal factual nexus between the Article I, section 12, compelling circumstances violation and the subsequently discovered evidence, including the evidence discovered as a result of the warranted search. The state did not attempt to meet its burden to establish attenuation in the trial court, and it has not advanced an attenuation argument on appeal. Attenuation is a fact-dependent question that we will not address for the first time on appeal. *See, e.g.*, *State v. Gabr*, 324 Or App 588, 596-97, 527 P3d 49 (2023) (declining to address the state's attenuation argument because there were questions as to how the record might have developed differently or what inferences the trial court might have drawn from the record). We thus conclude that the evidence should have been suppressed.

Article VII (Amended), section 3, of the Oregon Constitution requires us to affirm "notwithstanding any error committed during the trial" if the error was harmless. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). An error is harmless when "there is little likelihood that a particular error affected the verdict." *Id.* (internal quotation marks, brackets, and punctuation omitted). The state does not argue that any trial court error in concluding that the circumstances of the encounter did not become compelling prior to the point at which Ferrer provided *Miranda* warnings was harmless. We conclude that the error was not harmless. The prosecutor relied at trial on the physical evidence found in defendant's car, the video of him dozing in the patrol car, Ferrer's observations of defendant, some of defendant's statements to Ferrer after the circumstances became compelling, and the results of the blood and urine

tests, to discredit defendant and to urge the jury to find him guilty of reckless driving. On this record, there is more than a little likelihood that the error affected the jury's guilty verdict for reckless driving.

## IV.   CONCLUSION

The trial court erred when it determined that the circumstances of the encounter did not become compelling prior to the point at which Ferrer advised defendant of his *Miranda* rights, in violation of Article I, section 12. The subsequently obtained physical and testimonial evidence should have been suppressed. The error was not harmless.

Reversed and remanded.